**MAHER AZER,** individually, as successor in interest to **SGM PARTNERS,** and as assignee of **EZZAT W. WASSEF,** Plaintiff, Counterclaim–Defendant–Appellant, Cross–Appellee, v. **MICHAEL S. MYERS, GRUBB AND ELLIS COMMERCIAL BROKERAGE COMPANY** and **GRUBB AND ELLIS COMPANY,** Defendants, Cross–Claim Defendants–Appellees, Cross–Appellants, and **BEN GROMET,** Defendant, Counterclaimant, Cross–Claimant–Appellee, Cross–Appellant, and **MARGARET T. CAMERON,** Defendant, Counterclaimant, Cross–Claimant, Cross–Claim Defendant–Appellee, Cross–Appellant, and **ALFRED SHAHEEN,** Defendant, Counterclaimant, Cross–Claimant, Cross–Claim Defendant–Appellee, and **MICHAEL S. MYERS, GRUBB & ELLIS COMMERCIAL BROKERAGE COMPANY, GRUBB AND ELLIS COMPANY,** Third–Party Plaintiffs–Appellees, Cross–Appellants, and **BEN GROMET** and **MARGARET T. CAMERON,** Third–Party Plaintiffs–Appellees, Cross–Appellants, and **ALFRED SHAHEEN,** Third–Party Plaintiff–Appellee, v. **EZZAT W. WASSEF,** Third–Party Defendant–Appellant, Cross–Appellee

(CIV. NO. 85–1801)

and

**SGM PARTNERS** and **MAHER AZER,** Plaintiffs, Counter-claim–Defendants–Appellants, Cross–Appellees, v. **THE PROFIT COMPANY, LIMITED,** dba **PIZZA TIME THEATRE,** Defendant, Counterclaimant–Appellee, and **SGM PARTNERS** and **MAHER AZER,** Third–Party Plaintiffs–Appellants, Cross–Appellees, v. **MICHAEL S. MYERS, GRUBB AND ELLIS COMMERCIAL**

**BROKERAGE COMPANY** and **GRUBB AND ELLIS COMPANY,** Third–Party Defendants–Appellees, Cross–Appellants, and **BEN GROMET** and **MARGARET T. CAMERON,** Third–Party Defendants–Appellees, Cross–Appellants, and **ALFRED SHAHEEN,** Third–Party Defendant–Appellee, and **MICHAEL S. MYERS, GRUBB & ELLIS COMMERCIAL BROKERAGE COMPANY, GRUBB & ELLIS COMPANY,** Fourth–Party Plaintiffs, Counterclaim–Defendants–Appellees, Cross–Appellants, and **BEN GROMET** and **MARGARET T. CAMERON,** Fourth–Party Plaintiffs, Counterclaim–Defendants–Appellees, Cross–Appellants, and **ALFRED SHAHEEN,** Fourth–Party Plaintiff, Counterclaim–Defendant–Appellee, v. **EZZAT W. WASSEF,** Fourth–Party Defendant, Counterclaimant–Appellant, Cross–Appellee

(CIV. NO. 85–3466)

NOS. 12578, 12629, 12630, 12631, 12632, 12633, and 12634

FEBRUARY 14, 1990

BURNS, C.J., HEEN, J., AND CIRCUIT JUDGE HUDDY, IN PLACE OF ASSOCIATE JUDGE TANAKA, RECUSED

## OPINION OF THE COURT BY HEEN, J.

These appeals are from the amended judgment in the consolidated jury trial of Civil Nos. 85–1801 and 85–3466, which were filed by SGM Partners (SGM), Maher Azer (Azer) and Ezzat Wassef (Wassef).[1] On September 1, 1987, judgment on the jury's special verdict was rendered as follows:

(1) In favor of defendant The Profit Company, Limited (Profit), for $600,000 against SGM and Azer;

(2) In favor of Azer for $2,000,000 against defendants Michael S. Myers (Myers) and Grubb and Ellis Commercial Brokerage Company and Grubb and Ellis Company;[2]

(3) In favor of defendant Alfred Shaheen (Shaheen) on all claims against him by Azer;

(4) In favor of Azer and Wassef on the abuse of process claims against them by Defendants Ben Gromet (Gromet) and Margaret T. Cameron (Cameron);[3]

---

[1] Although the appeals were consolidated on February 3, 1988, we note that nos. 12578, 12629, 12630, 12631, and 12632, all filed by Azer, were interlocutory appeals which were not authorized by the lower court under Hawaii Revised Statutes (HRS) § 641–1 (1985), or properly certified under Rule 54(b), Hawaii Rules of Civil Procedure (HRCP) (1980). Appeal no. 12634, also filed by Azer, challenges an order awarding attorney's fees to defendants Ben Gromet and Margaret T. Cameron. The order appealed from in no. 12634 was a nullity, having been entered after the notice of appeal in no. 12633. *See infra* note 42. The dispositive appeal is no. 12633.

[2] Michael S. Myers, Grubb and Ellis Commercial Brokerage Company, and Grubb and Ellis Company were represented by the same attorneys below and in their joint appeals. Where appropriate those three parties will be referred to jointly in the opinion as Brokers. Grubb and Ellis Commercial Brokerage Company and Grubb and Ellis Company will collectively be referred to as Grubb and Ellis.

[3] Gromet and Cameron were represented by the same attorneys at all times in these proceedings. Hereinafter, where appropriate, Gromet and Cameron will be referred to jointly as G & C.

(5) In favor of Gromet on all claims against him; and

(6) In favor of Gromet for $164,558.12 against Azer on Azer's promissory note.[4]

The judgment also dismissed all other claims by or against any of the parties. On October 21, 1987, the court entered an amended judgment, discussed below, which does not affect the above provisions.

In subsequent orders the lower court held that Shaheen and G & C were entitled to attorney's fees and costs from Azer, but that Azer was not entitled to attorney's fees and costs from G & C and Brokers.

On November 30, 1987, SGM, Azer, and Wassef filed a notice of appeal. Thereafter Brokers and G & C filed cross–appeals. An order setting the amount of fees and costs awarded to G & C was filed on January 5, 1988. The court did not set the amount of fees to be recovered by Shaheen.

We (1) vacate the directed verdicts in favor of Gromet on Azer's negligence and offset claims against him; (2) reverse the denial of Azer's request for attorney's fees from Brokers; and (3) remand for (a) a retrial of Azer's negligence and offset claims against Gromet; and (b) a determination of attorney's fees and costs recoverable from Azer by Shaheen and G & C, and by Azer from Brokers. In all other respects we affirm.

## FACTS

On March 7, 1980, Alfred Shaheen, Ltd., a Hawaii corporation, Gromet, and Myers formed SGM for the purpose of, *inter alia*, managing and developing certain real property at 1680

---

[4] Although the judgment is entered in Gromet's name only, the record shows that Cameron is entitled to a portion of the recovery.

Kapiolani Boulevard.[5] In a September 21, 1981 amendment to the partnership agreement, Gromet and Myers were named "managing partners for the day–to–day operation of the partnership." By that time Shaheen had replaced Alfred Shaheen, Ltd., as a partner, and Azer and Wassef had become partners.

### The Courthouse Lease
### and Certification Agreement

On June 17, 1980, SGM leased space in a building constructed on the property to Courthouse Racquetball Corporation (Court-house), a Hawaii corporation.[6] Under the lease Courthouse had "[t]he right to the use of" 51 parking stalls on the property desig-nated by SGM. On May 19, 1982, SGM and Courthouse amended the Courthouse lease in an Agreement and Certification of Rents (Certification Agreement), which was negotiated and signed by Myers for SGM. The Certification Agreement reads in pertinent part as follows:

> (2) Landlord and Tenant may each have twenty five reserved parking stalls from 6:00 a.m. to 5:00 p.m. and [sic] which Landlord shall not have more than five reserved stalls on the second deck. Between 5:00 p.m. and 6:00 a.m. Landlord shall have 35 and tenant shall have 51 reserved parking stalls of which Landlord may not reserve any of the second deck. For each parking stall Landlord reserves on the premises day or evening in

---

[5] The property was originally leased to Alfred Shaheen, Ltd. SGM purchased the fee title to the property on December 27, 1983.

[6] The Courthouse lease actually names Alfred Shaheen, Ltd., as "Landlord." The record does not indicate that the Courthouse lease was assigned to SGM; however, the parties do not dispute that for all pertinent times in this litigation SGM was the lessor under the Courthouse lease.

addition to those listed above, Tenant shall receive a like number of additional reserved parking stalls.

## The Profit Lease

On May 1, 1983, SGM appointed Grubb and Ellis as SGM's exclusive leasing agent. Myers, who was also employed by Grubb and Ellis, negotiated on behalf of SGM to lease another portion of the building to Profit (Profit Lease). The lease was executed by Myers and Gromet on May 10, 1983. At that time Grubb and Ellis also acted as Profit's broker.

The provision of the Profit Lease pertinent to this opinion reads as follows:

**Parking:** Tenant is guaranteed the use of ninety–two (92) parking stalls. Twenty–five of said 92 stalls are located on the street level. Landlord and Tenant acknowledge that there are a total of 205 parking stalls available for all tenants of the building. From the hours of 5:00 p.m. to 12:00 midnight 42 of said 92 stalls are located on the street level and Tenant shall have the exclusive use of an additional 72 parking stalls (or a total of 164) as well as all available parking stalls not used by The Courthouse Racquetball Club (51 stalls).

After it had made alterations to its leased premises to accommodate its pizza parlor, Profit opened for business on December 12, 1983.[7] However, from the start of business SGM failed to provide Profit with either exclusive use of 92 parking stalls during the day or 164 parking stalls after 5:00 p.m. as the Profit Lease provided. Consequently, Profit began withholding rent.

---

[7]The record is not entirely clear as to when Profit began doing business. The December 12, 1983 date is stated in Profit's motion for prejudgment interest, and appears to be the most definitive date.

At the time the Profit Lease was executed, Cameron and her husband had acquired a percentage of Gromet's partnership interest.

## The Gromet Purchase

On June 4, 1983, Azer and Wassef purchased all of Gromet's and the Camerons' interest in SGM under one written agreement (Gromet Purchase).[8] After making a down payment, Azer and Wassef executed a promissory note for $165,000. The Gromet Purchase apportions the proceeds of the sale between Gromet and the Camerons, and provides:

5. **Indemnification/Release.** Buyers shall indemnify and hold Sellers free and harmless from any loss or liability directly or indirectly related to any act or omission of the Partnership, which act or omission occurs after the Closing, including, but not limited to, any contract or tort claims, demand, loss or liabilities, taxes, or any other obligations or liabilities relating to the Partnership.

The Gromet Purchase was closed on June 13, 1983.

## The Parking Agreement

On December 1, 1983, just prior to Profit's opening, SGM and Courthouse entered into an agreement (Parking Agreement) negotiated by Wassef and Shaheen, and signed by them and Azer on behalf of SGM.[9] The Parking Agreement reads in part:

1. Pursuant to the terms of [the Certification Agreement, SGM and Courthouse] agreed upon an allocation of

---

[8] The record indicates that Azer and Wassef also purchased Myers' partnership interest on June 4, 1983, in a separate instrument.

[9] Wassef became SGM's managing partner on June 8, 1983.

reserved parking in the [building] in the event that [SGM]
desired to reserve portions of the common parking area.
[SGM] and [Courthouse] now desire to allocate all of the
parking in the [building] from 5 p.m. to 6 a.m. each day.
[SGM] and [Courthouse] therefore agree such parking
shall be allocated during such hours as set forth in this
agreement.

Wassef testified that under the Parking Agreement Courthouse
was allotted 112 spaces for its use after 5:00 p.m., leaving 93 park-
ing stalls available for Profit and other tenants of the building.[10]

## The Shaheen Purchase

Effective December 30, 1983, Azer and Wassef purchased
Shaheen's partnership interest (Shaheen Purchase).[11] Azer and
Wassef made a down payment of $100,000 and executed a promis-
sory note for $617,000. The provision of the Shaheen Purchase
pertinent to this appeal reads:

7. **"As–Is" Condition.** Buyers acknowledge that
the property owned by the Partnership is accepted by
Buyers in an "as–is" condition without representation or
warranty. Seller represents and warrants that, as of the
Closing, it owns the Partnership Interest free and clear of

---

[10] From the copy of the Parking Agreement in evidence, it appears that Court-
house was allotted all of the parking stalls on the second parking deck and
approximately half of those on the third deck; however, we cannot tell precisely
how many stalls are allocated to Courthouse and SGM. The exhibit contains only
a diagram on which sections of the parking areas are designated for the parties.
Consequently, we use Wassef's testimony, which is not disputed, to determine the
allocation of parking stalls.

[11] The Shaheen Purchase in evidence is unsigned; however, the record indi-
cates it was signed on February 3, 1984, and was effective as of December 30,
1983.

any encumbrance or security interest not disclosed herein.

## The Profit Accord

On June 3, 1985, SGM's attorney wrote to Profit's attorney confirming the terms of an agreement (Profit Accord) between their clients purportedly resolving their differences over the parking and the withheld rent. Wassef negotiated the Profit Accord for SGM. The Profit Accord states that "[it] has been made necessary by the discrepancy between the number of parking stalls presently available and the provision for parking stalls in [the Profit Lease]," and establishes, *inter alia*, detailed arrangements for allotting parking stalls to Profit and the other tenants of the building, according to various time periods during the days of the week and the location of the spaces within the building's parking areas.[12] Profit surrendered some of its leased premises in exchange for a reduced rental and agreed to execute an amended lease reflecting those changes. SGM waived $250,000 of the delinquent rents and Profit agreed to make periodic payments to liquidate the balance of the delinquent rents. SGM failed to furnish Profit with the agreed parking and Profit refused to comply with the Profit Accord.

---

[12] The Profit Accord provided for Courthouse and Profit to split the parking stalls on the third parking deck with the number of spaces allocated to each varying according to the times of the day and the days of the week, and on holidays. Profit could not use any parking stalls on the second parking deck or on the ramps leading to the parking decks, but was allotted parking stalls on the grounds next to the building's loading docks. SGM also agreed to pay for the cost of parking in the "Pan Am Building next door[,]" for up to 46 of Profit's customers who might be unable to park on the premises.

## PROCEDURE BELOW
### Civil No. 85–1801

Meanwhile, on May 9, 1985, SGM, Azer, and Wassef filed Civil No. 85–1801 against Shaheen, Gromet, the Camerons, Myers, and Grubb and Ellis.[13] At that time SGM consisted of Azer and Wassef. On April 1, 1986, Azer filed an amended complaint individually, as successor in interest to SGM, and as assignee of Wassef, alleging that Azer had purchased Wassef's interest in SGM and the partnership had been dissolved. The amended complaint sought (1) an accounting from Shaheen, Gromet, Myers, and Cameron, as the former partners of SGM; (2) compensatory and punitive damages from Gromet and Myers, as former managing partners, for breach of fiduciary duties and negligence; (3) compensatory and punitive damages from Brokers for (a) breach of their fiduciary duties; (b) negligence; (c) misrepresentation; and (d) unfair and deceptive trade practices; (4) a return of the commission paid to Brokers; (5) a return of the monies Azer paid to G & C and Shaheen or, in the alternative, to offset any damages Azer might recover from them against the balances due under their respective purchase agreements; and (6) contribution and/or indemnification from all defendants for any damages Azer might be liable for as a result of the "misallocation of parking stalls."

Brokers filed a third–party complaint against Wassef for contribution or indemnification, alleging that by negotiating the Profit Accord he had caused whatever damage SGM might have suffered.

G & C counterclaimed against Azer and Wassef for, *inter alia*, the unpaid balance of their promissory note, and damages for

---

[13] When suit was filed, Cameron's husband had died. The action against him was voluntarily dismissed without prejudice.

malicious prosecution and abuse of process.[14] G & C also cross–claimed against Brokers and Shaheen, for indemnification or an apportionment of any damages for which they might be held liable.

Shaheen counterclaimed against Azer and Wassef for, *inter alia*, the balance owed on their promissory note.[15] Shaheen also cross–claimed against Myers, Cameron and Grubb and Ellis for indemnification.

### Civil No. 85–3466

On September 10, 1985, SGM filed Civil No. 85–3466 against Profit. In Count I SGM alleged that (1) Profit had breached the Profit Lease by failing to pay the rent; and (2) had breached the Profit Accord by (a) refusing to execute the lease amendment and (b) failing to make the required payments. SGM prayed for a writ of possession, monies payable under the Profit Accord, unpaid rents under both the Profit Lease and the Profit Accord, damages, interest, costs, and attorney's fees. In Count II SGM alleged that, on account of Profit's breach of the Profit Accord, SGM had the election to rescind the Profit Accord prior to trial and to recover the premises and all the unpaid rents under the Profit Lease, together with damages, interest, costs, and attorney's fees. On November 15, 1985, the circuit court issued a writ of possession, and SGM recovered the Profit premises.

Profit answered and alleged that the dispute arose because of SGM's failure to provide parking according to the Profit Lease. Profit admitted that it had executed the Profit Accord, but alleged

---

[14] In light of the fact that the amended complaint is by Azer as assignee of Wassef, the "counterclaim" against Wassef by G & C is really a third–party complaint.

[15] Shaheen's "counterclaim," also, is really a third–party complaint against Wassef.

that SGM had again failed to provide the agreed upon parking. Profit counterclaimed for damages for SGM's breach of the Profit Lease.

On April 10, 1986, upon SGM's motion, Azer was joined as a real party in interest,[16] and on December 5, 1986, Civil Nos. 85–1801 and 85–3466 were consolidated.

On December 9, 1986, Azer,[17] as counterclaim–defendant filed a third–party complaint against Myers, Grubb and Ellis, Shaheen, Gromet, and Cameron, alleging that they were responsible for any breach of the Profit Lease. The third–party defendants in turn filed fourth–party complaints against Wassef alleging that he was at fault for any damages incurred by Azer. Wassef in turn counterclaimed against the fourth–party plaintiffs, alleging that they were responsible for any damages suffered by any of the parties.

After a jury trial, judgment was entered on the special verdict. Azer appealed from the amended judgment and Brokers and G & C cross–appealed.

## THE APPEALS

Azer asserts as error:

(1) the denial of his motion to amend the judgment;

(2) the denial of his motion for sanctions for abuse of discovery against Brokers and their counsel;

(3) the amended judgment;

(4) the summary judgment in favor of Cameron on all of his claims against her;

---

[16] As noted in the discussion of the procedural facts in Civil No. 85–1801, SGM had been dissolved.

[17] Hereinafter, in discussing procedural matters below and on appeal, we will refer to SGM and Azer, collectively, as Azer.

(5) the granting of Gromet's motion for a directed verdict on Azer's claims against him;

(6) the giving of Shaheen's instruction regarding construction of the "as–is" clause in the Shaheen Purchase, and the denial of Azer's instruction on that issue;

(7) the award to Profit of pre–judgment interest and denial of pre–judgment interest to him; and

(8) the award of attorney's fees and costs to G & C and Shaheen; the denial of his request for attorney's fees and costs from G & C and Brokers; and the supplemental order setting the amount of fees awarded to G & C.

In their cross–appeal, Brokers assert as error:

(1) the denial of their motion for new trial; and

(2) the denial of their motion for mistrial.

In their cross–appeal, G & C assert as error:

(1) the refusal of their instruction on abuse of process and the giving of Azer's; and

(2) the court's decision to allow Azer to present a "rebuttal" witness.

With the exception of the question of attorney's fees and costs, which will be treated separately, we discuss the appeals in the following order: first, Azer; second, Brokers; third, G & C.

## AZER'S APPEAL
### 1.
#### a.
### The Denial of Azer's
### Motion to Amend the Judgment

Azer appeals from the order denying his motion to amend the judgment by striking the $600,000 award to Profit, arguing that the jury's verdict is internally inconsistent. We find no error.

Azer attacks the following interrogatories and answers:

## SECTION I
## Claims Between SGM Partners
## and The Profit Company

1. Was there an enforceable settlement agreement between SGM Partners and The Profit Company on June 3, 1985? Yes _x_ No ___
If "no," please do not answer question nos. 2 and 3, but go on to question no. 4.
If "yes," please answer question no. 2.

2. Was there an unexcused breach of the settlement agreement by The Profit Company? Yes ___ No _x_
If "no," please do not answer question no. 3, but go on to question no. 4.
If "yes," please answer question no. 3.

3. State the amount of damages to SGM Partners (Azer and Wassef) resulting from the breach of the settlement agreement by The Profit Company. $_____
If you answered "yes" to question no. 1, please do not answer question nos. 4, 5, 6 and 7, but go on to question no. 8.
If you answered "no" to question no. 1, please answer question no. 4.

4. Was there an unexcused breach by SGM Partners of the lease with The Profit Company ("The Profit Company Lease")? Yes _x_ No ___
If "no," please do not answer question no. 5, but go on to question no. 6.
If "yes," please answer question no. 5.

5. State the amount of damages to The Profit Company resulting from the breach of The Profit Company Lease by SGM Partners. $600,000

If your answer to question no. 4 was "no," please answer question no. 6.

If your answer to question no. 4 was "yes," please do not answer question nos. 6 and 7, but go on to question no. 8.

6. Was there an unexcused breach by The Profit Company of The Profit Company Lease with SGM Partners? Yes ___ No ___

If "no," please do not answer question no. 7, but go on to question no. 8.

If "yes," please answer question no. 7.

7. State the amount of damages to SGM Partners (Azer and Wassef) resulting from the breach of The Profit Company Lease by The Profit Company. $_____

Please go on to question no. 8 of Section II.[18]

(Footnote added.)

Citing *Vieau v. City & County*, 3 Haw. App. 492, 653 P.2d 1161 (1982), Azer argues that the jury's answers to questions 1, 4, and 5 render the verdict internally inconsistent. Consequently, Azer contends the trial court should have disregarded the answers to questions 4 and 5 as surplusage and not entered the $600,000 judgment in favor of Profit. Azer urges this court to strike the jury's award to Profit or, alternatively, to remand the dispute between SGM and Profit for a new trial. Azer also argues that the question of whether the Profit Accord was a settlement or an accord was not presented to the jury. We find no merit in the arguments.

The crux of Azer's appeal is that the Profit Accord was a substituted contract which extinguished any claim that SGM and Profit had against each other for violations of the Profit Lease.[19]

---

[18] Section II of the special verdict form deals with Brokers' alleged negligence.

[19] We find no merit in Profit's argument that Azer raises this issue for the first time on appeal. It was one of Azer's theories of action below.

Consequently, Azer argues, when the jury found the Profit Accord enforceable, question nos. 4, 5, 6, and 7 were irrelevant and the jury should not have answered them.

Profit, on the other hand, asserts that the Profit Accord was not a substituted contract but was merely an accord which SGM had breached. Profit further asserts that it could elect to sue on either the Profit Lease or the Profit Accord. Under Profit's theory, the jury correctly answered the special verdict questions.

Azer does not challenge any of the jury instructions relating to the dispute between him and Profit.[20] Consequently, he has not preserved any error in those instructions for review. *See Chambers v. City & County*, 48 Haw. 539, 406 P.2d 380 (1965). Moreover, we think the instructions correctly presented the law

---

[20]The instructions pertinent to the dispute between Azer and Profit regarding their rights to enforce the Profit Accord are as follows:

In order to prevail on the breach of the settlement agreement claim, Azer has the burden of establishing by a preponderance of the evidence all the facts necessary to prove the following issues, one, that SGM Partners and Profit entered into a settlement agreement in settlement of SGM Partners' claims against Profit for failure to pay rent and Profit's claims against SGM Partners for failure to provide the number of parking stalls indicated in the lease. Two, that SGM Partners was ready, willing and able to perform. Three, that Profit was the first to materially breach the settlement agreement. Four, the nature and extent of SGM Partners' damages.

In order to prevail on the claim for breach of lease, Azer has the burden of establishing by a preponderance of the evidence all the facts necessary to prove the following issues: One, that SGM Partners and Profit entered into a lease contract for Profit's rent of space at 1680 Kapiolani Boulevard. Two, that SGM Partners has performed all the terms and conditions the lease required it to perform. Three, that Profit breached the lease contract by failing to pay SGM Partners rent. And four, the nature and extent of the damages.

An accord is a new contract under which a party promises to accept certain performance in satisfaction of the original contract. If the new contract is breached, the other party may enforce either the original contract or the new contract, and may seek recovery for alleged damages suffered as a result of the breach.

governing both Azer's and Profit's theory of the legal effect of the Profit Accord.

The **Restatement (Second) of Contracts** (1979) **(Restatement)** clarifies the distinction between a substituted contract and an accord. The **Restatement** § 279 states that:

(1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.

(2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty. Comment a to § 279 explains that:

A substituted contract is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it. A common type of substituted contract is one that contains a term that is inconsistent with a term of an earlier contract between the parties. If the parties intend the new contract to replace all of the provisions of the earlier contract, the contract is a substituted contract. On the other hand the **Restatement** § 281 states:

Accord and Satisfaction

(1) An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty.

(2) Until performance of the accord, the original duty is suspended unless there is such a breach of the accord by the obligor as discharges the new duty of the obligee to accept the performance in satisfaction. If there is such a breach, the obligee may enforce either the original duty or any duty under the accord.

(3) Breach of the accord by the obligee does not discharge the original duty, but the obligor may maintain a

suit for specific performance of the accord, in addition to any claim for damages for partial breach.

The question for the jury really was whether the Profit Accord was a substituted contract or an accord and satisfaction. However, neither party demanded that the special verdict form present that question to the jury. Nevertheless, the omission is not fatal to the verdict.

Rule 49(a), Hawaii Rules of Civil Procedure (HRCP) (1980), provides:

> If [in submitting a question to the jury in a special verdict form] the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

Where the parties have failed to demand the submission of a fact question to a jury, "it will be presumed on appeal that [the trial judge] made whatever finding was necessary in order to support the judgment that he entered." 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2507 (1971). Thus, the lower court is presumed in this case to have found that the Profit Accord was an accord and satisfaction which SGM had materially breached prior to any breach by Profit.

Close analysis of the special verdict in the light of the parties' claims supports the Rule 49(a) presumption. Profit had waived any claim for damages for SGM's breach of the Profit Accord. Profit's counterclaim asserted damages only for SGM's breach of the Profit Lease. It did not claim any damages for a breach of the Profit Accord. If the jury had found a substituted contract, it would not have awarded any damages to Profit. Since the jury awarded

damages to Profit for SGM's breach of the Profit Lease, it must have found (1) an accord and satisfaction; (2) that SGM materially breached the Profit Accord; and (3) that SGM's breach preceded and excused Profit's breach.

It follows from the above that the affirmative answer to question no. 1 did not, as Azer argues, render questions 4, 5, 6, and 7 irrelevant. Question no. 1 only determined that the Profit Accord was an enforceable agreement; it did not *per se* establish whether the agreement was a substituted contract or an accord.

### b.

Azer did not show in his opening brief's statement of points "where in the record the alleged error occurred and where it was objected to" as required by Rule 28(b)(4), Hawaii Rules of Appellate Procedure (1987). Consequently, we will not consider his argument that, since the jury had answered question no. 1 in the affirmative, the instruction following question no. 3 required the jury to skip question no. 4.

### c.

Azer argues further that the court erred in awarding judgment to Profit because Profit did not assert a compulsory counterclaim for breach of the Profit Accord as required by Rule 13(a), HRCP (1980).[21] We disagree.

---

[21] Rule 13(a), HRCP (1980) provides in pertinent part:

Rule 13. **COUNTERCLAIM AND CROSS–CLAIM.**

(a) **Compulsory Counterclaims.** A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Pleadings should be construed liberally and not technically, *Au v. Au*, 63 Haw. 210, 626 P.2d 173 (1981), and to do justice. Rule 8(f), HRCP. In its answer Profit admitted signing the Profit Accord, but alleged that SGM failed to fulfill its conditions. Under Profit's theory it waived all claims for SGM's breach of the Profit Accord and, therefore, it did not need to counterclaim for damages resulting from that breach. Profit chose instead to seek damages for SGM's breach of the Profit Lease. Moreover, in its counter-claim Profit alleged that it negotiated in good faith to resolve the parking dispute but that SGM continued to fail to furnish the parking provided for under the Profit Accord. That is sufficient in our view to satisfy the requirement of Rule 13(a).

## 2.
### Denial of Azer's Motion for Sanctions
### Against Brokers and Their Counsel

On the day before trial, Azer, while being deposed in another case, *Azer v. The Courthouse Racquetball Corp.*, First Circuit Court Civil No. 87–0562, learned of a letter to Profit from Court-house's attorney, Edward E. Case (Case), written on November 23, 1983, before Profit opened for business. Case was a member of the law firm of Carlsmith, Wichman, Case, Mukai, and Ichiki, which also represented Brokers below. The letter advised Profit that Courthouse intended to assert its rights to reserved parking under the Certification Agreement and questioned whether there was adequate parking for Profit. Profit denied receiving the letter. Although Azer had requested that Brokers produce all documents relating to the dispute, the letter was not produced, apparently because it was not in Brokers' possession. It was in Brokers'

lawyers' possession, but in their file for Courthouse, not for SGM.[22]

Brokers moved before trial to exclude the letter from evidence. The court granted the motion, finding that the letter's contents and the fact that it was written by a lawyer would have been prejudicial. Azer then filed a motion to add Case as a witness, which the court denied. On August 19, 1987, after the verdict was entered, Azer moved the court to sanction Brokers and/or their counsel by requiring them to pay his attorney's fees and costs for all proceedings relating to the letter, and to pay any damages awarded to Profit from Azer. The motion was denied.

Azer contends that the letter was relevant to Profit's claim that it was not aware of parking problems before it opened for business, and should have been produced in response to his discovery request for documents, even though it was not in Brokers' possession. He contends that the letter was deliberately withheld and the court erred in denying his motion for sanctions. Alternatively, Azer argues that, since the substance of the letter was relevant to Profit's defense, his dispute with Profit should be remanded for a new trial after he has had sufficient opportunity for discovery regarding the letter. We find no merit in Azer's arguments.

The question of sanctions for abuse of discovery is within the discretion of the trial court, and the exercise of that discretion will not be overturned on appeal absent a clear showing of abuse. *Lothspeich v. Sam Fong*, 6 Haw. App. 118, 711 P.2d 1310 (1985). A trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of one of the parties. *Bloudell v. Wailuku Sugar Co.*, 4 Haw. App. 498, 669 P.2d 163 (1983). Azer

---

[22]Under Rule 35(a), HRCP (1980), a party may request an opposing party to produce documents "which are in the possession, custody or control of the party upon whom the request is served[.]"

has failed to carry his burden of convincing us that the trial court abused its discretion. *Johnson v. Robert's Hawaii Tour, Inc.*, 4 Haw. App. 175, 664 P.2d 262 (1983).

Even assuming, but not deciding, that Brokers' attorneys abused discovery, as SGM argues, Azer was not prejudiced by the trial court's exclusion of either the letter or Case's testimony. During trial, apparently for the reason that its subject matter was relevant, the court read a stipulation to the jury stating that Case wrote the letter, that it was placed in the hands of a messenger for delivery, and that Case's firm's records indicate the letter had been hand delivered. Azer also put on proof that the letter was delivered to Profit. Additionally, Courthouse's director of operations, Patrick Nolan, testified that he discussed the letter with Profit's agent, Bruce Gee.

### 3.
### The Amended Judgment

On September 11, 1987, Brokers moved to alter or amend (Motion to Amend) the judgment to state that the Profit Accord was no longer enforceable. The thrust of the Motion to Amend was that SGM could not enforce the Profit Accord. Azer asserts that the lower court erred in granting the Motion to Amend.

In a review of a trial court's decision on a motion under Rule 59(e), HRCP, to alter or amend a judgment, the question is whether the court abused its discretion. *Cabral v. McBryde Sugar Co.*, 3 Haw. App. 223, 647 P.2d 1232 (1982). We find no abuse of discretion.

Brokers made the Motion to Amend because on August 31, 1987, Azer, alleging to be the assignee under the Profit Accord of

Profit's claims relating to the allocation of parking spaces,[23] had filed a separate suit in circuit court against Brokers (Civil No. 87–2809–08) for damages on account of those claims. The thrust of the complaint in Civil No. 87–2809–08 is that, since the jury found in this case that the Profit Accord was enforceable, Azer is entitled, as Profit's assignee, to seek damages from Brokers for breach of their duties as Profit's agent in negotiating the Profit Lease.

In advancing the Motion to Amend Brokers argued that, since the jury found that the Profit Accord was enforceable, but that Profit had not committed an unexcused breach, the jury must have found that SGM breached the Profit Accord first. Thus, Brokers asserted, the Profit Accord was no longer enforceable. In granting the motion the court stated that the clear inference from the jury verdict was that SGM breached the Profit Accord. The judgment was amended to read in pertinent part as follows:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that in . . . Civil No. 85–3466, there was an enforceable settlement agreement on June 3, 1985 between SGM Partners and The Profit Company, Limited, of which there was no unexcused breach by The Profit Company, Limited, *and therefore the settlement agreement is no longer enforceable*, and that, in addition, judgment be entered in favor of The Profit Company, Limited, on its claim for breach of lease[.]

---

[23]Paragraph 12 of the Profit Accord reads as follows:

12. The Profit Company will assign to SGM Partners or its designee all claims that The Profit Company had, presently has, or may have in the future to damages or other relief arising out of the allocation of parking stalls in the Building, rental disputes related to such allocation, and other consequential damages, losses, or injuries resulting from such allocation.

The underscored language is the language added to the original judgment by the lower court. As discussed above the amended judgment is in accord with the special verdict form.

Although he cites no cases to support the proposition, Azer also argues that the court's action violated his right to a jury trial on the issue. We disagree.

Under Rule 49(a), *supra*, when Azer failed to demand that the question be submitted to the jury, he waived his right to a jury trial on the issue. However,

> [r]ule 59(e) does not authorize the court to alter or amend a judgment entered upon a jury's verdict in any manner that would constitute a re–examination of the facts found by the jury in contravention of the Seventh Amendment.

6A *Moore's Federal Practice* ¶ 59.12[1], at 59–271 (2d ed. 1989); *see* 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2817 n.32, at 111 (1973).

The Seventh Amendment to the United States Constitution, which preserves the right to a jury trial, is not binding on the states.[24] *Harada v. Burns*, 50 Haw. 528, 445 P.2d 376 (1968). Nevertheless, "respect for the jury's assessment of the evidence is constitutionally mandated" by Article I, § 13 of the Hawaii State Constitution.[25] *Harkins v. Ikeda*, 57 Haw. 378, 381, 557 P.2d 788,

---

[24] The Seventh Amendment reads as follows:

In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re–examined in any Court of the United States, than according to the rules of the common law.

[25] Article I, § 13 of the Hawaii State Constitution reads in pertinent part as follows: "In suits at common law where the value in controversy shall exceed one thousand dollars, the right of trial by jury shall be preserved." When *Harada v. Burns*, 50 Haw. 528, 445 P.2d 376 (1968), was decided, the provision was numbered Article I, § 10.

791 (1976) (footnote omitted). Consequently, the question remains whether the court invaded the province of the jury when it amended the judgment. We hold it did not.

As outlined above, the jury decided that SGM inexcusably and materially breached the Profit Accord. Therefore, no "further factual inquiry" was required to determine that the agreement was no longer enforceable by Azer. 6A *Moore's Federal Practice*, *supra*, ¶ 59.12 n.45, citing *McGee v. United States*, 17 F.R. Serv. 2d 1093, 1097 (D. Pa. 1972), and Azer's right to a jury trial was not violated.

## 4.
### Summary Judgment in Favor of Cameron

Prior to trial Cameron moved for summary judgment (SJ Motion). Cameron argued below that since the claims against her were based on events that took place after the closing of the Gromet Purchase, the provisions of the Gromet Purchase quoted above required Azer to indemnify her for any liability caused by those events. The SJ Motion was granted and Azer appealed.[26]

The question is whether there is no genuine issue of material fact and Cameron is entitled to judgment as a matter of law. *Bidar v. AMFAC, Inc.*, 66 Haw. 547, 669 P.2d 154 (1983). Azer argues that the indemnity provision of the Gromet Purchase is ambiguous and, therefore, questions of fact exist regarding the meaning of the terms used therein.

Contrary to Azer's argument, the indemnity agreement is clear, and the construction of its terms is a question of law. *Stewart*

---

[26] Gromet also filed a summary judgment motion on the same grounds. Gromet's motion was denied on the ground that Gromet's alleged negligence in negotiating and signing the Profit Lease occurred prior to the indemnity agreement. Gromet has not appealed that issue.

*v. Brennan*, 7 Haw. App. ___, 748 P.2d 816 (1988). The indemnity agreement requires Azer to hold Cameron free from all liability related to any act or omission of the partnership as constituted after the date of closing, June 13, 1983.

Azer's argument that the act or omission occurred on May 10, 1983, when the Profit Lease was signed is without merit. It is clear from the record, even viewing the evidence in the light most favorable to Azer, *Bidar, supra*, that the act or omission of SGM, the breach of the Profit Lease, occurred on December 12, 1983, when Profit opened for business. The Profit Lease provided that its term began when Profit first opened for business or six months from the date of execution, whichever occurred first. The delayed start of the term was to allow Profit time to prepare its premises for business. Until the lease term began, Profit could not demand, and Azer was not required to provide, parking. The mere execution of the Profit Lease did not create liability.

We find no genuine issue of material fact and the SJ Motion was properly granted.

### 5.
### Directed Verdict in Favor of Gromet

At the end of Azer's case–in–chief Gromet filed motions for directed verdicts on Azer's claims against him for negligence, offset, breach of fiduciary duties as managing partner, and for a partnership accounting. Azer argues that the court erred in granting the motions. In our view the court erred only in granting Gromet's motion for directed verdict on Azer's claims for negligence and offset. Azer's claims as outlined herein will be discussed *seriatim*.

On a motion for directed verdict the evidence and reasonable inferences therefrom must be considered in the light most favorable to the non–moving party and if from the evidence a jury can reasonably conclude that the non–movant's claim is sustainable,

the motion must be denied. **_Shannon v. Waterhouse_**, 58 Haw. 4, 563 P.2d 391 (1977), **_cert. denied_**, 440 U.S. 911, 99 S. Ct. 1223, 59 L. Ed. 2d 460, **_reh'g denied_**, 441 U.S. 917, 99 S. Ct. 2020, 60 L. Ed. 2d 390 (1979).

a.

Myers testified that Gromet had a small part in negotiating the Profit Lease. Viewing that evidence in the light most favorable to Azer, a jury could reasonably find that Gromet was negligent in negotiating a lease which contained parking provisions that created a conflict with the Certification Agreement.

Gromet argues, however, that the directed verdict on his alleged negligence can be sustained because the indemnification clause in the Gromet Purchase entitled him to the same freedom from liability as Cameron. We disagree. Gromet's alleged negligence antedated the closing of the Gromet Purchase. Moreover, the indemnification clause applies to acts or omissions of the partnership, not to Gromet's individual negligence while acting for the partnership. The cases cited by Gromet are inapplicable to the circumstances of this case.

b.

In view of the possibility that Azer might recover some damages on his negligence claim, it was error to grant a directed verdict on his offset claim.

c.

Azer's claim that Gromet breached his fiduciary duties as a managing partner is without merit. The evidence shows that, although Azer and Wassef had orally agreed to purchase Gromet's

partnership interest, Gromet was still a managing partner of SGM when he signed the Profit Lease.[27] However, under the amended partnership agreement Gromet and Myers were only "managing partners for the day–to–day operation of the partnership," and none of the partners could execute any lease without the written consent of the other partners. Clearly, Gromet did not sign the Profit Lease as a managing partner.

d.

We find no merit in Azer's accounting claim against Gromet. Under HRS § 425–122 (1985), a partner is entitled to an accounting of partnership affairs where

(a) the partner has been wrongfully excluded by his or her co–partners from the partnership's business or property;

(b) he or she is accorded the right to an account by an agreement;

(c) HRS § 425–121 (1985) so requires; or

(d) it is just and reasonable under the circumstances.

HRS § 425–121 provides that a partner is accountable as a fiduciary for any benefits or profits he or she derives without the consent of the other partners from a transaction connected with the partnership's affairs or its property.

Azer has not indicated how his accounting claim comes within any of the statutory provisions, or how he may otherwise be entitled to an accounting.

---

[27] The record shows that Gromet signed the Profit Lease during the period when the Gromet Purchase had been orally agreed to but not yet closed. Gromet signed at Wassef's request, since Azer and Wassef resided on the mainland.

6.

## The Lower Court's Instruction Regarding
## the Agreement Between Azer and Shaheen

Shaheen asserted below that the "as is" clause in the Shaheen Purchase relieved him of liability to Azer. Azer asserted that the clause applied only to the condition of the land and the building. Shaheen, however, contended that the clause related to both the partnership property and his partnership interest, and that when Azer entered into the Shaheen Purchase, he waived any claims against Shaheen.

Azer argues on appeal that the court erred in instructing the jury that,

> [an] "As Is" provision in any sale puts the buyers on
> notice that the seller makes no warranties about the qual-
> ity or condition of the thing sold[,]

because the instruction was incomplete.[28] Azer argues that the instruction should have included language advising the jury that such a clause is subject to the same principles of construction governing contracts generally. The argument is without merit.

Jury instructions must be considered as a whole, and a refusal to give an instruction that correctly states the law is not error if another instruction expressing a substantially similar principle is given. *State v. Pioneer Mill Co.*, 64 Haw. 168, 637 P.2d 1131 (1981).

The jury charge in this case includes instructions advising the jury of the principles to apply in the construction of contract language to the same extent as Azer contends the challenged

---

[28]Shaheen's argument that the issue was not preserved for appeal because Azer did not register an objection after the instructions were read is specious. Azer had earlier registered written objections to the instruction. It was not necessary to object again when the instructions were read. *See* Rule 51, HRCP (1980).

instruction should have done. Viewed in the context of the entire charge, the instruction complained of was neither incorrect nor prejudicial. *Eastern Star, Inc. v. Union Bldg. Materials Corp.*, 6 Haw. App. 125, 712 P.2d 1148 (1985).

## 7.
## Pre–Judgment Interest

Azer argues that the trial court abused its discretion when it granted Profit's motion for pre–judgment interest from February 3, 1984, and awarded Azer interest only from the date of the verdict, July 21, 1987.

As stated above, the breach of the Profit Lease occurred on December 12, 1983, when Profit opened for business and SGM by its own admission failed to provide the agreed upon parking. Accordingly, Profit's motion requested that pre–judgment interest on its $600,000 award start on that date. However, Profit acceded to Azer's argument below that the earliest date that SGM could have breached the lease was February 3, 1984, when the Shaheen purchase was executed. Consequently, the court established that date for beginning Profit's pre–judgment interest. Azer argues on appeal that there is no valid reason for treating his request for pre–judgment interest differently from Profit's.[29] We disagree.

The award of pre–judgment interest is solely within the discretion of the trial court. HRS § 636–16 (1985); *McKeague v. Talbert*, 3 Haw. App. 646, 658 P.2d 898 (1983). One of the purposes of pre–judgment interest is to cut delays in litigation, and to undo substantial injustice caused by such delays. *Id.*

---

[29]In the lower court Azer suggested separate dates for calculating his requested pre–judgment interest on various items of damages based on when the losses occurred.

In its oral ruling on Azer's motion for pre–judgment interest, the trial court noted that the Defendants had made good faith efforts to settle the claims. The lower court apparently felt that Azer's recalcitrance contributed to delaying the proceedings. Azer has failed to convince us that the court abused its discretion.

Finally, Azer argues that the fact that the jury's award to him was greater than the settlement offer below, indicated he was correct in not settling the dispute. However, we do not deem that to indicate an abuse of discretion.

## BROKERS' CROSS–APPEAL

Brokers argue that the court erred in denying their motions for new trial and for mistrial. We find no error.[30]

### 1.
### New Trial

Brokers argue that, since the evidence was insufficient to support the jury's verdict on liability and damages, the lower court erred in denying their motion for new trial. We disagree.

When reviewing a trial court's denial of a motion for new trial based upon insufficient evidence, the appellate court will review

---

[30] We find no merit in Brokers' argument that the trial court erred in denying their motions for directed verdict on damages, made at the close of Azer's case–in–chief, and for judgment *non obstante veredicto*, made at the end of trial. When, after their motion for directed verdict was denied, they proceeded to present a defense they waived any error in that denial. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2534 (1971). Additionally, the record does not show that Brokers renewed their motion for directed verdict at the close of the case. Consequently, they were precluded from filing the motion for judgment *non obstante veredicto*, and cannot raise the latter's denial as error on appeal. *Vieau v. City & County*, 3 Haw. App. 492, 653 P.2d 1161 (1982). However, Brokers' motion for new trial allows them to raise the issue of the sufficiency of the evidence on appeal. *Id.*

the record on appeal and if it contains substantial evidence, more than a scintilla, to support the jury's verdict the reviewing court will not upset the verdict. *Lovell Enters., Inc. v. Campbell–Burns Wood Prods., Inc.*, 3 Haw. App. 531, 654 P.2d 1361 (1982).

a.
## Liability

The dispute between Azer and Brokers was whether Azer's inability to supply Profit with adequate parking was caused by a conflict between the Certification Agreement which was negotiated by Myers and the Profit Lease, or a conflict between the Profit Lease and the Parking Agreement, which was negotiated for SGM by Wassef and Shaheen. The Profit Lease was negotiated for SGM by Myers and, according to Myers' testimony, Gromet. Brokers contend that the Certification Agreement and the Profit Lease were unambiguous and Courthouse was entitled to an increased number of parking stalls only if the Profit Lease specifically designated any parking stalls for Profit. They assert that the Profit Lease does not operate to reserve parking stalls for Profit and, consequently, the "add on" clause of the Certification Agreement was not triggered. Therefore, they contend it was Azer's own contributory negligence in negotiating and entering into the Parking Agreement that caused Profit's parking problems. We hold that the evidence was sufficient to support the verdict.

i.
## Ambiguity of the Certification
## Agreement and the Profit Lease

Brokers argue that the trial court erred when it concluded that, although considered separately the Certification Agreement and

the Profit Lease were unambiguous, considered together they created an ambiguity. We find no error.

The question is whether the words "guaranteed" and "exclusive," although unambiguous in the context of the Profit Lease, have the same meaning as the word "reserved" in the Certification Agreement. We hold that they do, and construe the court's conclusion of ambiguity to mean that the Certification Agreement and the Profit Lease are in conflict.

The terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning. *Maui Land & Pineapple Co. v. Dillingham Corp.*, 67 Haw. 4, 674 P.2d 390 (1984). Guarantee is defined as:

[A]n agreement by which one person undertakes to secure another in the possession or enjoyment of something.

*Webster's Third New Int'l Dictionary* 1007 (1981). Exclusive is defined as:

[E]xcluding or having the power to exclude (as by preventing entrance or debarring from possession, participation or use); limiting or limited to possession, control, or use (as by a single individual or organization or by a special group or class).

*Id.* at 793. Reserve means to set aside or apart. *Id.* at 1930.

In our view, the words reserved, guaranteed, and exclusive, in their common usage, are synonymous. In the Profit Lease the plain, ordinary and accepted meaning of guaranteed and exclusive is that Profit will have access to certain parking stalls to the exclusion of everyone else.[31] The parking provisions of the Profit Lease

---

[31] The fact that the Profit Lease guarantees exclusive use of a prescribed number of stalls rather than specifically designated stalls does not, in our view, detract from our interpretation. In either case, it is clear that SGM did not provide Profit with the promised number of parking stalls, at the times prescribed, under the Profit Lease.

are meaningless without such a construction. Consequently, the Certification Agreement and the Profit Lease conflict. That conflict supports the jury's finding that Brokers were negligent and that Azer was not contributorily negligent.

Brokers further argue that the only admissible evidence of the intent of the parties to the Certification Agreement came from the testimony of Myers and Don Dymond (Dymond), who represented Courthouse in negotiating the Certification Agreement. They testified that only in the event SGM "reserved" parking stalls in addition to those allocated to it under the Certification Agreement would Courthouse be entitled to additional parking. Consequently, Brokers contend, there is no evidence to support the finding of negligence. The argument is without merit.

Dymond also testified that,

if another parking stall was taken out of the pool and we were expressly prohibited from parking in that stall then yeah, we would be entitled to another one. * * * If it's taken out of the pool it would be reserved. It wouldn't be available for open parking.

The record contains sufficient evidence for the jury to determine that a parking space guaranteed to Profit for its exclusive use was taken out of the pool and reserved within the meaning of the Certification Agreement.

### ii.
### Azer's and Wassef's Testimony

At trial, Azer and Wassef testified as to their understanding of the Certification Agreement and the Profit Lease. At that time Brokers requested the court to instruct the jury that it could not consider Azer's and Wassef's testimony in construing the documents. Brokers argue that the court erred in denying their request. The argument is without merit. Although there are sound reasons for

the court to instruct the jury at the time testimony is received that it is to be considered for a limited purpose, 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 105[05], at 105–44 (1989), it is not error for the court not to do so where the same instruction is given as part of the general charge. *State v. Perez*, 64 Haw. 232, 638 P.2d 335 (1981). Here, the jury was instructed that it could not use the testimony of persons who had not negotiated and drafted the contract provisions to determine the intent of the parties to the contract.

## b.
## Damages
### i.
### Lost Rents

Azer calculated his lost rents by using the basic contract rent in the Profit Lease, which was $1.50 per square foot ($1.50 rate). He testified that when Profit surrendered portions of its premises pursuant to the Profit Accord, the surrendered areas remained vacant until other tenants of the building occupied them at the same $1.50 rate.[32] Those tenants, in turn, vacated premises they had been occupying. Azer further testified that new tenants moving into the building during that period paid that same rent.[33] Azer

---

[32] Azer testified that parts of the Profit Lease premises were taken over by a liquor store and Shaheen, Ltd., a clothing manufacturer.

[33] In Brokers' opening brief they assert that Azer did not testify that "replacement tenants" for the premises vacated by Profit were paying $1.50 per square foot, because in calculating future losses Azer testified that "[t]here is a difference in rents between Profit Company lease and current leases of approximately $2,000.00 per month." The argument is specious. Azer's testimony does not refer to a reduced rental rate, but to a loss of $2,000.00 per month occurring because of vacancies arising from the dispute with Profit.

calculated his lost rents by applying the $1.50 rate to the periods when Profit's surrendered premises and the premises the other tenants vacated remained vacant.[34] Azer calculated his damages through June, 1987, when trial started, to be $1,939,951, and future damages as $973,100.[35]

Brokers assert that the $1.50 rate does not properly measure Azer's damages, without proof that another tenant with knowledge of the inadequate parking would have paid the same rent as Profit. They contend that the proper measure of damages was the fair rental value of the premises, which required expert testimony. We disagree.

In *Uyemura v. Wick*, 57 Haw. 102, 551 P.2d 171 (1976), the supreme court held that a party to a contract who sustains a loss on account of a breach of that contract by the other contracting party is entitled to compensation commensurate with his loss, but the extent of loss must be shown with reasonable certainty and cannot be based upon mere speculation or guess. In *Uyemura*, the plaintiff had produced no evidence of damages.

---

[34] In *Marco Kona Warehouse v. Sharmilo, Inc.*, 7 Haw. App. ___, 768 P.2d 247 (1989), we held that a landlord whose tenant had wrongfully abandoned its leased warehouse bays was obligated to mitigate damages and could not hold the abandoning tenant liable for rents it lost on warehouse bays vacated by other tenants who, with the lessor's consent, moved into the wrongfully abandoned bays, where the wrongfully abandoning tenant had not consented to be so liable. Azer's recovery, here, includes such lost rents as part of his damages. However, Brokers do not raise Azer's method of calculating his damages as a point on appeal, and did not challenge it below.

[35] Azer calculated his future losses on the basis that 9,054 square feet of the Profit space would remain vacant through August 1, 1987, and 7,850 square feet would remain vacant through November 30, 1987; that a portion of the liquor store premises would be vacant through September 30, 1987; the Profit Lease dispute created long term vacancies; and he would have to pay interest on loans he was required to take out for building expenses he could not pay because of his lost income.

The evidence in this case shows Azer's loss with reasonable certainty and eliminates speculation. *Ferreira v. Honolulu Star Bulletin, Ltd.*, 44 Haw. 567, 356 P.2d 651, *reh'g denied*, 44 Haw. 581, 357 P.2d 112 (1960). Azer testified that he was actively engaged in managing the rental of the building when he recovered Profit's premises. He had direct knowledge of his losses. The jury did not need expert testimony to assist them in assessing damages. *See* Rule 702, Hawaii Rules of Evidence (1981).

### ii.
### Out–of–Pocket Damages

Brokers assert that the evidence of SGM's out–of–pocket expenses was insufficient because it consisted only of Azer's oral testimony.[36] They contend that Azer should have produced business records to substantiate his claims. We disagree.

At the time of trial, Azer was the sole remaining owner of SGM. He had personal knowledge of the expenses occasioned by the failure of the Profit Lease. While Azer may have made a stronger case by putting its business records in evidence we do not believe they were essential to prove the extent of damages in these circumstances. The evidence showed Azer's loss with reasonable certainty, *Uyemura v. Wick*, *supra*, and was sufficient, if believed by the jury, for them to assess Azer's damage.

### iii.
### Evidence of the Building's Value

We reject Brokers' argument that the trial court erred in granting Azer's motion *in limine* to exclude evidence of the value of the building at 1680 Kapiolani Boulevard at the time of trial. The

---

[36] Azer testified that his out–of–pocket expenses amounted to $567,520.

value of the building at the time of trial was simply irrelevant to the issues.

## 2.
## Denial of Mistrial Motion

On the third day of trial, the court noted for the record the presence of the jury, the parties, and all counsel. Thereupon, Azer's counsel stated:

I'd like the record also to reflect the presence of Wesley Ichida sitting in the courtroom[.] I believe he's an attorney for some of the insurance carriers for Mr. Myers and Grubb and Ellis.

Shortly thereafter, Brokers moved for a mistrial on the basis of that remark. The trial court denied the motion. Brokers argue that the statement was prejudicial and the trial court erred in denying the mistrial motion.

The record shows that Myers himself had already raised the issue of insurance by testifying that Azer brought this action to recover money from Brokers' insurance company. At that time the court instructed the jury to consider the fact that Brokers were insured only for the purpose of determining Azer's motive. Brokers do not indicate how Azer's counsel's remark prejudiced them. We find no abuse of discretion in the denial of the motion. *Johnson v. Robert's Hawaii Tour, Inc., supra.*

## GROMET'S AND CAMERON'S APPEAL

On May 9, 1985, Azer, Wassef, and SGM filed Civil No. 85-1801. On July 1, 1985, Gromet wrote to Azer and Wassef demanding payment of $133,080.12 as the balance, including interest, due on the Gromet Purchase promissory note. On July 19, 1985, the attorney who then represented Azer and Wassef, Stephen

B. MacDonald (MacDonald), replied to Gromet informing him that Civil No. 85–1801 had been filed but that MacDonald was withholding service of the complaint on Gromet in order to avoid litigation with him. MacDonald offered to dismiss Civil No. 85–1801 against Gromet if Gromet would postpone collection until Azer and Wassef resolved their claims against Brokers, and if Gromet would assign to Azer any potential claims he might have against Brokers. Gromet testified that Wassef orally offered the same arrangement to Cameron. When G & C rejected the proposals, they were served with the complaint and summons nearly six months after the action was filed.

G & C filed counterclaims for malicious prosecution and abuse of process. The parties stipulated to dismissal of the malicious prosecution claims prior to trial. However, the court denied Azer's motion to dismiss the abuse of process claims.

The thrust of G & C's argument on appeal is that Civil No. 85–1801 was filed for the ulterior motives of coercing Gromet to testify against Myers, and compelling G & C to postpone collection on their promissory notes. They contend that the court erred in refusing their instruction no. 68 defining the term "process"[37] and giving Azer's instruction no. 148.[38] They also assert that instruction no. 148 improperly restricted their final argument. Finally,

---

[37] G & C's instruction no. 68 reads as follows:

The term "process" as used in the term "abuse of process" includes the entire range of procedures incident to the litigation process, including serving a complaint, noticing depositions, utilization of motions, and filing of an entire lawsuit.

[38] Azer's instruction no. 148 reads as follows:

The mere institution of an action by the filing and service of a summons or complaint does not amount to an abuse of process. The commencement of a lawsuit for the purpose of obtaining a settlement (which may include the payment of money or insurance proceeds) is included in the goals of proper process and, therefore, does not by itself give rise to liability for abuse of process.

they contend the court erred when it allowed MacDonald, as a "rebuttal witness," to testify on the reasons for the delay in service. We find no error.[39]

## 1.
## Adequacy of Instructions

In *Myers v. Cohen*, 5 Haw. App. 232, 687 P.2d 6, *rev'd on other grounds*, 67 Haw. 389, 688 P.2d 1145 (1984), we stated that it is the purpose for which the process is used rather than the nature of the process that creates the abuse of process claim. In *Wong v. Panis*, 7 Haw. App. ___, 772 P.2d 695 (1989), we held that process is abused when it is used primarily for an improper ulterior motive. Also, in *Myers, supra*, we stated that settlement is includable in the goals of proper process.

Taken as a whole and in light of all the evidence, the jury instructions correctly stated the applicable law. *Agee v. Kahului Trucking & Storage, Inc.*, 67 Haw. 365, 688 P.2d 256 (1984); *Adair v. Hustace*, 64 Haw. 314, 640 P.2d 294 (1982).

## 2.
## MacDonald's Testimony

G & C argue that the lower court reversibly erred in allowing MacDonald to testify, since he was not listed as a witness in Azer's pre-trial statement as required by Rule 18(a)(1), Rules of the Circuit Court (1971).[40] We disagree.

---

[39] In his answering brief Azer argues that we should sanction G & C for bringing a frivolous appeal. We disagree. We do not find G & C's appeal to be manifestly and palpably without merit. *Harada v. Ellis*, 4 Haw. App. 439, 667 P.2d 834 (1983).

[40] Rule 18(a)(1), Rules of the Circuit Court (1971) provides:

We have held that the rule should be scrupulously observed and have affirmed the trial court's barring of an unlisted witness. *Nature Conservancy v. Nakila*, 4 Haw. App. 584, 671 P.2d 1025 (1983). Nevertheless, the rule does not pose an absolute bar to the testimony of undisclosed witnesses. *See Cozine v. Hawaiian Catamaran, Ltd.*, 49 Haw. 77, 412 P.2d 669 (1966). In *Cafarella v. Char*, 1 Haw. App. 142, 615 P.2d 763 (1980), we stated that:

> We do not condone the practice of calling unlisted "rebuttal" witnesses except in cases where there has been genuine surprise arising out of an unexpected turn in the testimony or the interests of justice so require.

*Id.* at 148, 615 P.2d at 768. In this case, we think the interests of justice support the trial court's decision to allow MacDonald to testify.

The thrust of G & C's malicious prosecution claim was that the filing of Azer's action against them was *per se* an abuse of process, because it was filed for ulterior motives. That was the focus of their opening statement and their evidence. When G & C had ended their case–in–chief, Azer moved for a directed verdict. The lower court, after oral argument from counsel, indicated it was inclined to grant the motion based on its understanding that the law required a showing that Azer had committed an act, other than the mere filing of suit, that constituted abuse of the court's process. [41] At that point G & C's counsel asserted that he should be allowed to argue to the jury that the delay in service was an act of abuse of process. It was then that Azer's counsel informed the court that he would call MacDonald to explain the delay.

---

Each party shall disclose the theory of his case, including the basic facts that he intends to prove and the names and addresses of all witnesses that he intends to call.

[41] We do not decide whether or not the court's understanding of the law was correct.

## ATTORNEY'S FEES AND COSTS

The court made the following dispositions of the parties' requests for attorney's fees and costs:

October 9, 1987: Shaheen's motion was granted; however, Shaheen had "the right to submit detailed reasonable billings allowing AZER opportunity to respond to the reasonableness of the fees[.]"

October 14, 1987: G & C's request for fees and costs in defending against Azer's claims was granted. The court granted G & C's request for fees on the promissory note action, not to exceed 25% of $164,558.12, the amount recovered. However, it deferred final determination of the dollar amount of the fee to give Azer the opportunity to examine G & C's counsel's affidavit regarding fees and to present further argument on reasonableness.

October 15, 1987: Azer's motion for attorney's fees and costs from G & C was denied.

October 21, 1987: The court awarded attorney's fees and costs to Profit; however, it held that Profit should submit a supplemental affidavit and Azer could respond as to

| | the reasonableness of Profit's request. |
| November 30, 1987: | The court denied Azer's motion for recovery of attorney's fees and costs from Brokers. |
| January 5, 1988: | In a "supplemental order," the court, over Azer's objection awarded attorney's fees of $93,965.85 to Gromet and $19,223.40 to Cameron.[42] |

1.

We note, first, that Azer questions whether we have appellate jurisdiction over the awards to Profit and Shaheen, and the October 14, 1987 award to G & C, since those awards did not finally dispose of the amount of the fee.[43]

The award of attorney's fees involves two questions: (1) whether attorney's fees are awardable, and (2) the reasonableness of the award. *See Horst v. Horst*, 1 Haw. App. 617, 623 P.2d 1265 (1981). An order awarding attorney's fees to the prevailing party but not setting the amount of the fee, does not fully adjudicate the attorney's fee issue; however, the decision that the prevailing party is entitled to attorney's fees is reviewable separately from the

---

[42] The January 5, 1988 supplemental order was entered after the November 30, 1987 notice of appeal from the amended judgment, and the lower court did not have jurisdiction to make it. *Wisdom v. Pflueger*, 4 Haw. App. 455, 667 P.2d 844 (1983). Consequently, that order is not before us. G & C's argument that the court orally set the amount of the fees on November 30, 1987, is without merit. The dispositive act is the written order. *Naki v. Hawaiian Elec. Co.*, 50 Haw. 85, 431 P.2d 943 (1967).

[43] Shaheen also challenges jurisdiction on the same ground.

question of the reasonableness of the award. *Memphis Sheraton Corp. v. Kirkley*, 614 F.2d 131 (6th Cir. 1980); *cf. Security Pac. Mortgage Corp. v. Miller*, 71 Haw. 65, 783 P.2d 855 (1989). Consequently, notwithstanding the fact that the lower court in this case must still set the amount of the fees, the determination that fees are awardable is properly included in the appeal from the final judgment. *See Kahalewai v. Rodrigues*, 4 Haw. App. 446, 667 P.2d 839 (1983).

### 2.

Attorney's fees are awardable to the prevailing party only where authorized by statute, agreement, or rule of law. *Smothers v. Renander*, 2 Haw. App. 400, 633 P.2d 556 (1981). In this jurisdiction, where a promissory note or written agreement provides for attorney's fees, HRS § 607–17 (1985) governs the amount awarded.[44] HRS § 607–14 (1985) provides for an award of attorney's fees in actions in the nature of assumpsit.[45] The nature of the

---

[44] HRS § 607–17 (1985) provides in pertinent part:

**Attorney's fees when provided for in promissory notes, etc.** Any other law to the contrary notwithstanding, where an action is instituted in the district or circuit court on a promissory note or other contract in writing which provides for an attorney's fee the following rates shall prevail and shall be awarded to the successful party, whether plaintiff or defendant:

(1) Where the note or other contract in writing provides for a fee of twenty–five per cent or more, or provides for a reasonable attorney's fee, not more than twenty–five per cent shall be allowed;

(2) Where the note or other contract in writing provides for a rate less than twenty–five per cent, not more than the specified rate shall be allowed;

provided that the fee allowed in any of the above cases shall not exceed that which is deemed reasonable by the court.

[45] HRS § 607–14 (1985) provides:

**Attorneys' fees in actions in the nature of assumpsit.** In all the courts, in all actions in the nature of assumpsit there shall be taxed as attor-

action as determined from the substance of the entire pleading, the nature of the grievance, and the relief sought, is dispositive of the issue whether attorney's fees must be awarded under HRS § 607–14. *Schulz v. Honsador, Inc.*, 67 Haw. 433, 690 P.2d 279 (1984).

### a.
### Award of Attorney's Fees to G & C

The court awarded attorney's fees to G & C for their successful defense of Azer's action and for their counterclaim recovery on Azer's promissory note. We hold that they were entitled to attorney's fees for both actions. *Smothers v. Renander, supra.*

Azer sued G & C for an accounting, failure of consideration, offset, and for contribution and indemnification. He lost. The question is whether Azer's action was in the nature of assumpsit. We answer that part of it was.

---

neys' fees, in addition to the attorneys' fees otherwise taxable by law, to be paid by the losing party and to be included in the sum for which execution may issue, a fee which the court determines to be reasonable but which shall not exceed the amount obtainable under the following schedule:

25 per cent on first $1,000 or fraction thereof.
20 per cent on second $1,000 or fraction thereof.
15 per cent on third $1,000 or fraction thereof.
10 per cent on fourth $1,000 or fraction thereof.
5 per cent on fifth $1,000 or fraction thereof.
2.5 per cent on any amount in excess of $5,000.

The above fees shall be assessed on the amount of the judgment exclusive of costs and all attorney's fees obtained by the plaintiff, and upon the amount sued for if the defendant obtains judgment. The fees provided for by this section shall not be taxed in any action where the plaintiff obtains a judgment which includes attorneys' fees upon a promissory note or other evidence of indebtedness, when the promissory note or other evidence of indebtedness contains a provision for the recovery of costs of collection or attorneys' fees.

In *Hong v. Kong*, 5 Haw. App. 174, 683 P.2d 833 (1984), we held that an action for rescission and recovery of money paid under an agreement is an action in the nature of assumpsit within the meaning of HRS § 607–14, *supra,* and attorney's fees are taxable against the losing party in such an action. An action based upon failure of consideration for the recovery of money paid on a contract is, in effect, an action for rescission. *See* 17 Am. Jur. 2d *Contracts* § 397 (1964).

HRS § 607–14, *supra,* provides for attorney's fees for the defense of the failure of consideration claim. On remand the court must determine what part of G & C's attorney's fees are allocable to the failure of consideration claim.

Additionally, Azer's promissory note provides for a reasonable attorney's fee incurred in collection. Consequently, the lower court correctly decided that G & C were entitled to attorney's fees under HRS § 607–17, *supra,* for their counterclaim.

### b.
### Award of Attorney's Fees to Shaheen

Azer's claim against Shaheen was based on the same grounds as his claim against G & C. For the reasons already expressed as to G & C's award, Shaheen is entitled to attorney's fees on Azer's failure of consideration claim. HRS § 607–14, *supra.* Moreover, the Shaheen Purchase provides for an attorney's fee in an action for its enforcement or interpretation.

### c.
### Profit's Attorney's Fees

Profit counterclaimed against Azer for breach of the Profit Lease. Profit won. The lease provides for attorney's fees, and the award was proper under HRS § 607–17, *supra.*

### d.
### Denial of Azer's Request for
### Attorney's Fees from G & C

Azer argues that the lower court erred in denying his request for attorney's fees from G & C. We find no error.

G & C's action against Azer sounded in tort for abuse of process, for which the prevailing party may not recover attorney's fees. *See DeMund v. Lum*, 5 Haw. App. 336, 690 P.2d 1316 (1984).

### e.
### Denial of Azer's Request for Attorney's
### Fees and Costs from Brokers

Azer's action against Brokers was based on negligence and breach of fiduciary duty arising from the Exclusive Authorization of Lease. The jury found for Azer on both claims but awarded lump sum damages.

The Exclusive Authorization of Lease authorizes recovery of a reasonable attorney's fee by a party who commences litigation for its enforcement. Azer brought his fiduciary breach action to compel Brokers to answer in damages for breach of the agreement. It constituted an action "instituted on a contract." Therefore, he is entitled to attorney's fees for the fiduciary breach count under HRS § 607–17, *supra*. *See Bibo v. Jeffrey's Restaurant*, 770 P.2d 290 (Alaska 1989) (action against corporate directors for breach of fiduciary duty sounds in contract). The lower court erred in not awarding fees for Azer's recovery on that count. *Schulz v. Honsador, Inc.*, *supra*. Brokers' argument that a breach of a fiduciary duty under a contract does not constitute a breach of an "express term" of the contract is without merit.

The lower court also erred in denying Azer's request for costs. Rule 54(d), HRCP.

Azer is not entitled to attorney's fees and costs on his negligence claim. *DeMund v. Lum, supra.*

## CONCLUSION

We vacate the orders directing verdicts in Gromet's favor on Azer's claims of negligence and offset, and remand those claims for retrial. We vacate the order denying Azer's request for attorney's fees and costs from Brokers and remand for an award of fees and costs in accordance with this opinion. Also, on remand the court should determine and award reasonable attorney's fees to G & C and Shaheen in accordance with this opinion. In all other respects, we affirm the judgment.

On the briefs:

*William Meheula* and *Nadine Y. Ando* (McCorriston, Miho & Miller) and *Wesley W. Ichida* (Case & Lynch) (with them on the opening brief, *Mary Jane Connell*; on the answering brief, *Gilbert Coloma-Agaran*; Carlsmith, Wichman, Case, Mukai & Ichiki) for Michael S. Myers, Grubb and Ellis Commercial Brokerage Company, and Grubb and Ellis Company.

*Susan Oki Mollway* and *Anne L. Sylvester* (Cades, Schutte, Fleming & Wright) for SGM Partners, Maher Azer, and·Ezzat W. Wassef.

*James J. Bickerton* (Bickerton, Ramos–Saunders & Dang) (with him on the opening brief, *Gary M. Slovin*; Goodsill, Anderson, Quinn & Stifel) for Ben Gromet and Margaret T. Cameron.

*Gary Shigemura* and *Randall N. Harakal* (Shigemura & Harakal, of counsel) (with them on the opening brief, *Julian L. C. Chang*) for Alfred Shaheen.

*Thomas P. Dunn* for The Profit Company.