929 P.2d 99

**UNITED TRUCK RENTAL EQUIPMENT LEASING, INC., Plaintiff–Appellee,**

v.

**KLEENCO CORP., Defendant–Appellant.**

No. 15883.

Intermediate Court of Appeals of Hawai'i.

Dec. 10, 1996.

Patrick M. Moscatello, Richard Hacker, on the brief, Honolulu, for plaintiff–appellee.

Patricia J. McHenry, Darryl H.W. Johnston, on the briefs, Honolulu, for defendant–appellant.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

We hold Defendant–Appellant, Kleenco Corp. (Kleenco), the renter of a truck from Plaintiff–Appellee, United Truck Rental Equipment Leasing, Inc. (United), was liable to United under the terms of a rental contract for the retail market value of the truck and for United's loss of use of the truck after it was stolen from Kleenco. We also hold that the trial court (court) properly allowed a witness not listed in United's pre-trial statement to testify in rebuttal.

Accordingly, we affirm the court's October 15, 1991 judgment (the judgment) except for the court's award for loss of use damages as to which we remand for an entry of judgment awarding nominal damages only.

1. The truck was initially rented for two days, but this period was extended for a total rental period of eighteen days.

2. United's complaint alleged as follows:
 3. On or about January 2, 1988, Defendant Kleenco Corp. rented from Plaintiff a one-half ton 1987 Toyota standard pickup truck.
 4. Defendant Kleenco Corp. executed a rental agreement for the truck.... According to the agreement, Defendant agreed to pay Plaintiff for all loss or damage to the vehicle, regardless of negligence.
 5. Defendant's driver left the key in the truck and as a result said truck was stolen. Plaintiff's stolen vehicle is a total loss.
 6. Plaintiff suffered the following damages resulting form [sic] its vehicle being stolen:

I.

Kleenco is in the business of providing commercial cleaning services. United is in the business of renting trucks to the general public. On January 2, 1988, Keith Sugioka (Sugioka), an employee of Kleenco at the time, rented a 1987 one-half ton Toyota pickup truck (the truck) from United for a total of eighteen days with a return date of January 20, 1988.[1] Having the authority to do so, Sugioka signed a rental agreement for the truck on behalf of Kleenco (the Agreement).

The truck was stolen while in Kleenco's possession after a Kleenco employee left the keys in the ignition of the unattended and unlocked truck. At the time of the theft, the truck was parked facing the street at the front of a row of trucks in an alley next to Kleenco's facility.

On January 10, 1989, United brought suit against Kleenco for the loss of the truck. United's complaint did not specifically refer to contract or bailment law but stated the essential facts referred to above.[2]

On February 1, 1989, Kleenco answered the complaint and counterclaimed.[3] On February 21, 1989, United answered the counterclaim.

On June 24, 1991, the case proceeded to a non-jury trial. The court dismissed Kleenco's counterclaim, awarded judgment against Kleenco for $8,957.23, and filed its combined findings of fact and conclusions of law on October 15, 1991. The decision stated, in

| | |
|---|---|
| Loss to vehicle: | $7,500.00 |
| Appraisal charge: | $ 31.20 |
| Loss of use of vehicle: | $ 572.94 |
| TOTAL DAMAGES | $8,104.14 |

....

·WHEREFORE, Plaintiff demands that Judgment enter against Defendant Kleenco Corp. in the sum of $8,104.14 together with attorney's fees, costs, and such further relief [as] the court deems appropriate.

3. Kleenco's counterclaim asserted that United's failure to inform Kleenco that it had no theft insurance on the truck constituted an unfair and deceptive trade practice under Hawai'i Revised Statutes (HRS) § 480–2 (Supp.1988), a breach of the implied covenant of good faith and fair dealing contained in the agreement, and fraud.

pertinent part [4]:

4. [Kleenco's] counterclaim is hereby dismissed.

5. The court finds that the language contained in the "full responsibility" box contained on [United's] rental agreement is clear and unambiguous and that by initialing the full responsibility box, [Kleenco] took full responsibility for the loss of [United's] vehicle including the loss by theft.

6. Accordingly, [Kleenco] is liable to [United] and Judgment shall enter against [Kleenco] as and for the following amounts:

| | |
|---|---|
| Loss of vehicle, based on the fair market value of the vehicle identified in this action | $7,500.00 |
| Appraisal fee | $31.20 |
| Loss of vehicle use | $550.00 |
| Subtotal | [$]8,081.20 |
| Attorney's fees | [$]827.03 |
| Court Costs | [$]30.00 |
| Notary | [$]4.00 |
| Sheriff fees | [$]15.00 |
| Total Judgment | $8,957.23 |

Judgment was entered accordingly on October 15, 1991.

Kleenco filed a motion to alter or amend the judgment (the motion) on October 25, 1991, asserting in its supporting memorandum that (1) United should not recover more than the wholesale value of the stolen truck, (2) United cannot recover "lost volume" damages for loss of the use of the truck, and (3) United's rental agreement did not provide for recovery of costs associated with efforts to recover on a breach of contract.[5]

On December 23, 1991, the court entered its order denying the motion.

Kleenco appealed on January 17, 1992.[6] On appeal, Kleenco does not challenge the court's dismissal of its counterclaim. Therefore, we affirm the judgment as it relates to Kleenco's counterclaim.

4. The court failed to distinguish which of its statements were findings of fact and which were conclusions of law.

5. United does not raise the issue of recovery of costs associated with a breach of contract in its appeal.

We examine the four contentions raised by Kleenco on appeal.

II.

A.

1.

At common law, the rental of a motor vehicle creates a bailment for the mutual benefit of the parties. *Davis v. M.L.G. Corp.*, 712 P.2d 985, 987–88 (Colo.1986); *Chabraja v. Avis Rent A Car Sys., Inc.*, 192 Ill.App.3d 1074, 140 Ill.Dec. 221, 223, 549 N.E.2d 872, 874 (1989); *Omni Aviation v. Managers, Inc. Buckley*, 97 N.M. 477, 641 P.2d 508, 510 (1982); 14 F. Lewis, *Blashfield Automobile Law and Practice* § 475.13, at 395 (3rd ed.1969). A bailment is "a delivery of personal property by one person to another in trust for a specific purpose, with an express or implied contract that the property will be returned or accounted for when the specific purpose has been accomplished or when the bailor reclaims the property." *Davis*, 712 P.2d at 988; *accord Waugh v. University of Hawai'i*, 63 Haw. 117, 132, 621 P.2d 957, 958 (1980). Because United's rental of the truck to Kleenco was a bailment for their mutual benefit, Kleenco, the bailee, was under a duty to "use ordinary care and diligence in the safeguarding of the bailor's property, and [it was] answerable for loss or injury resulting from failure to exercise such care, or for any loss or injury due to [its] negligence, or ordinary negligence." *M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.*, 234 Kan. 682, 675 P.2d 864, 868 (1984) (citation, internal quotation marks, and ellipsis points omitted). In that regard, "[t]heft is clearly one of the harms against which a bailee must protect." *Id.* 675 P.2d at 869. Therefore, under the rules of bailment, Kleenco bore the risk of loss if it was negligent in its handling of the vehicle.[7]

6. On February 25, 1992, Kleenco applied for a stay of the judgment pending appeal. Kleenco's application was granted on March 6, 1992. On March 16, 1992, Kleenco and United stipulated that Kleenco would deposit $8,957.23 with the court in lieu of posting a supersedeas bond.

7. Generally, whether a bailee was negligent is a question of fact. *Toston v. McCracken*, 555

However, the parties are free to enter into a contract to alter their common law duties "provided their agreement does not contravene public policy or violate a statute." *Davis,* 712 P.2d at 988. The contract involved here was the Agreement.

## 2.

The Agreement was United's standard rental form. It purportedly contained the entire agreement between the parties.[8] The two relevant provisions on the front of the Agreement, the "collision waiver" and "full responsibility" provisions, are arranged in printed boxes.

The collision waiver provision stated the following:

### Collision Waiver

By initialing, renter agrees to pay the sum of $_____ per day or fraction thereof additional and the renter will be responsible only for the first $_____ of damage (except cube box) provided vehicle is operated in conformity with rental agreement. Collision waiver does not cover overhead roof damage. Any damage to cube box is not in any way covered by this waiver.

Initial here ×_____

The "full responsibility" provision located below the collision waiver provision stated the following:

### Full Responsibility

By initialing, renter agrees to pay United Truck for all loss or damage to vehicle (regardless of negligence).

Initial here ×_____

Sugioka did not initial or mark the "collision waiver" provision. Rather, he initialed the "full responsibility" provision as evidenced by the initials "K.S." on the "initial here" line.

Kleenco contends the court erred in concluding that the language contained in the "full responsibility" provision in United's rental agreement is clear and unambiguous and that by initialing the full responsibility provision, Kleenco took full responsibility for the loss of United's vehicle, including loss by theft. Instead, Kleenco argues that the Agreement is ambiguous because (1) the plain and common definition of "collision" does not include theft, (2) "the rest of the Agreement does nothing to elucidate what is meant" by "collision waiver," and (3) the Agreement does not define "full responsibility" as including theft. Thus, Kleenco maintains that a "potential renter would . . . reasonably understand that neither the 'collision waiver' nor the related 'full responsibility' box—or any of the rest of the Agreement—covered the subject of theft coverage."

## 3.

■■■ "[T]he construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *Cho Mark Oriental Food, Ltd. v. K & K Int'l,* 73 Haw. 509, 519, 836 P.2d 1057, 1063 (1992) (citations omitted). "Collision" means the "[s]triking together of two objects, one of which may be stationary." *Black's Law Dictionary* 264 (6th ed.1990). A collision waiver clause effectively waives any claims by a vehicle company against the renter for collision damage. *See Automobile Leasing & Rental, Inc. v. Thomas,* 100 Nev. 261, 679 P.2d 1269, 1271 (1984). On the other hand, "theft" is "[t]he act of stealing." *Black's Law Dictionary* 1477 (6th ed.1990).

S.W.2d 48, 51 (Mo.App.1977) (affirming trial court's finding of negligence for theft of motorcycle with keys in ignition from a locked building); *Lew v. Goodfellow Chrysler–Plymouth, Inc.,* 6 Wash.App. 226, 492 P.2d 258, 260 (1971) (affirming trial court's finding of negligence for theft of car left in adjoining parking lot with keys behind car visor); *but cf. M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.,* 234 Kan. 682, 675 P.2d 864, 870 (1984) (holding that "[t]he leaving of the keys in the ignition of an unlocked and unattended vehicle parked on an outdoor lot at

night is negligence as a matter of law") (citation omitted).

**8.** The agreement states in pertinent part:

13. The terms and conditions set forth on both sides of this instrument constitute[] the entire Agreement between the parties hereto. No rights of UNITED TRUCK under this Agreement may be waived unless in writing and signed or initialed by UNITED TRUCK.

We agree that the term "collision" would not include "theft." However, we do not agree, as Kleenco urges, that the "full responsibility" obligation under the agreement did not render Kleenco liable in the event the truck was stolen while in its possession. For, examining the contract as a whole, we discern no ambiguity in the contract.

### B.

#### 1.

 A word or phrase within a contract is ambiguous if, examining the word or phrase in the context of the entire contract, the word or phrase is reasonably susceptible to more than one meaning. *Stewart v. Brennan*, 7 Haw.App. 136, 142–43, 748 P.2d 816, 821 (1988); *Maui Land & Pineapple Co., Inc. v. Dillingham Corp.*, 67 Haw. 4, 11, 674 P.2d 390, 395 (1984); *DiTullio v. Hawaiian Ins. & Guar. Co., Ltd.*, 1 Haw.App. 149, 155, 616 P.2d 221, 226 (1980). In other words, " 'ambiguity is found to exist . . . only when the contract, taken as a whole, is reasonably subject to differing interpretation.' " *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 209–10, 684 P.2d 960, 964 (1984) (quoting *U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1, 3 (Alaska 1979)) (citation and internal quotation marks omitted). So, " '[a]n agreement should be construed as a whole and its meaning determined from the entire context and *not from any particular word, phrase or clause.*' " *Maui Land & Pineapple*, 67 Haw. at 11, 674 P.2d at 395 (quoting *Ching v. Hawaiian Restaurants, Ltd.*, 50 Haw. 563, 565, 445 P.2d 370, 372 (1968)) (emphasis added).

#### 2.

 In that respect, paragraph three, on the back of the Agreement, states in pertinent part:

Renter is responsible for and will reimburse UNITED TRUCK upon demand for all loss or damage whatsoever (regar[d]less

of negligence) to Vehicle and other equipment, but [sic] specified on the reverse side of this Agreement per occurrence, unless Vehicle was used, operated or driven in violation of any provision of this Agreement.

While unartfully drafted, the foregoing clause renders the renter responsible for "all loss or damage whatsoever" to the vehicle, except as "specified" on the front of the Agreement. The "specified" exception to the renter's liability is not effective, however, if the vehicle was "used, operated or driven in violation of any provision" of the contract.

The only specified exception to the renter's responsibility is set forth in the "collision waiver" provision. Under that provision, if elected, the renter is "responsible only for the first $___ of damage provided," if, as reiterated in paragraph three, the "vehicle is operated in conformity with" the contract.[9]

The "full responsibility" clause setting forth Kleenco's responsibility "for all loss or damage" is also reiterated in the paragraph three statement that the renter is responsible for "all loss or damage whatsoever."

Construing the contract as a whole, the plain meaning of these provisions is that under the Agreement, the renter was responsible for "all loss or damage" except to the extent of the "collision waiver" amount, and in that respect, only if the renter operated the vehicle in conformity with the provisions of the contract.

Therefore, if Kleenco had accepted the collision waiver option and not signed the "full responsibility" box, it would have been responsible for all losses and damages except for damages resulting from a collision (less the amount specified in the collision waiver provision). Because Kleenco did not accept the collision waiver, however, it was liable for all losses and damages including those resulting from a collision.

We believe an ordinary reading of a renter's "full responsibility" under the Agree-

---

9. The "warning" provision located on the front of the Agreement similarly subjects collision coverage to the condition that the truck be operated in conformity with the Agreement: "Notwithstanding payment of collision waiver, if Vehicle is used in violation [of] any provision of this agreement, or in off-road use, or is damaged by striking overhead objects, Renter shall be liable for all damages, as provided on the reverse hereof."

ment "for *all* loss or damage to [the] vehicle" and an undertaking of responsibility "for *all* loss or damage whatsoever" would broadly encompass any mechanism of loss, including theft. (Emphases added). *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 108, 839 P.2d 10, 24 (1992) ("[I]t is fundamental that terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning.") (citing *SGM Partners v. The Profit Co.*, 8 Haw. App. 86, 123, 793 P.2d 1189, 1212 (1990)), *recon. denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation and internal quotation marks omitted). Accordingly, we hold the court was correct in concluding Kleenco was liable for loss caused by a theft of the vehicle.[10]

### III.

### A.

Kleenco contends that the court erred in awarding United $7,500 because the award was based on the retail market value of the truck rather than "on the wholesale or 'bulk' market" value. United purchased the truck at the wholesale price of $6,419.93 plus tax. Consequently, Kleenco reasons, the $7,500 award placed United in a better position than it would have been in had there been no breach of contract. Accordingly, Kleenco does not appear to challenge the fair market value aspect of the award but rather the market, retail or wholesale, used by United's expert in arriving at his opinion.[11]

### B.

### 1.

▆ A trial court's determination of the appropriate standard for measuring damages is a conclusion of law which is freely reviewable by an appellate court. *Nani Koolau Co. v. K & M. Const., Inc.*, 5 Haw.App. 137, 141–42, 681 P.2d 580, 585 (1984).

In that respect, it is " 'a well established principle in the law of damages that, when [a party] sustains a loss by breach of a contract, [the party] is entitled to have just compensation commensurate with [the] loss' and 'that [the] damages awarded should be in such amount as will actually or as precisely as possible compensate the injured party.' " *Amfac, Inc.*, 74 Haw. at 128, 839 P.2d at 32 (1992) (quoting *Ferreira v. Honolulu Star–Bulletin, Ltd.*, 44 Haw. 567, 573–74, 356 P.2d 651, 655, *reh'g denied*, 44 Haw. 581, 357 P.2d 112 (1960)); *see also Richards v. Kailua Auto Mach. Service*, 10 Haw.App. 613, 622, 880 P.2d 1233, 1238 (App.1994) ("The general rule in measuring damages is to give a sum of money to the person wronged which as nearly as possible, will restore him or her to the position he or she would be in if the wrong had not been committed.") (citations and internal quotation marks omitted).

▆ In awarding damages, the court adopted the amount at which Duane Lee (Lee), United's "expert in the area of vehicle appraisal and vehicle evaluation," valued the truck. Lee testified that $7,500 is the "actual cash value"[12] of the lost truck and is based

---

10. Moreover, as stated above the signature line, Kleenco agreed "to be bound by the terms and conditions listed on both sides of [the] Rental Agreement and to return [the] vehicle to United on or before the due-back date." Correspondingly, paragraph 1 on the back of the Agreement states Kleenco was obligated "to return [the] Vehicle ... in the same condition when received ... to the PLACE and on the DUE BACK DATE specified on the reverse side hereof...." Nowhere does the contract waive Kleenco's liability to United for damages resulting from Kleenco's failure to return the vehicle.

11. Fair market value is defined as "[t]he amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both

having reasonable knowledge of the relevant facts." *Black's Law Dictionary* 597 (6th ed.1990); *see also In re AMFAC, Inc.*, 65 Haw. 499, 502, 654 P.2d 363, 366 (1982) ("the value in money of any property for which that property would sell on the open market by a willing seller to a willing buyer") (citations omitted); *Housing Finance and Dev. Corp. v. Harold K.L. Castle Foundation*, 79 Hawai'i 321, 328–29, 901 P.2d 1300, 1307–08 (App.1995); *Antolik v. Harvey*, 7 Haw.App. 313, 319, 761 P.2d 305, 309 (1988).

12. Actual cash value is considered synonymous with fair market value. *Black's Law Dictionary* 597 (6th ed.1990). Duane Lee's estimate did not include the four per cent excise tax or a three dollar certificate fee that would be charged in an actual purchase.

on the average dealer estimate of a "like kind vehicle." Specifically, Lee spoke with three local dealers, Windward Toyota, Kaimuki Toyota, and Toyota City. Lee testified that he gave each dealer such information as the "year, make, model, condition, equipment, [and] mileage," of the lost vehicle and he asked each dealer for the selling price of such a vehicle on the open market on the date of the loss. The "local market" and the "Kelly bluebook"[13] price of the vehicle were also considered in arriving at his opinion. On cross-examination, Lee stated that his valuation was based upon the retail market value and not wholesale market value of the vehicle. Lee's valuation then, was based upon the fair market value of the vehicle in the retail market.

### 2.

■ "Whether the retail or wholesale price will govern when calculating damages depends on the replacement market available to the injured party." 4 J. Nates et al., *Damages in Tort Actions* § 37.01[1][b], at 18 (1994) (hereinafter *Damages in Tort*). Thus, a consumer,[14] who usually is limited to purchasing an item at retail prices, is entitled to recover the retail market value for the loss of that item. *Id.* Contrastingly, when a retailer's[15] stock-in-trade is damaged, the retailer is entitled to recover the wholesale market value of the stock because that value represents the retailer's actual replacement cost. *See e.g. Ocean Elec. Co. v. Hughes Laboratories, Inc.*, 636 So.2d 112 (Fla.Dist. Ct.App.1994); *Chevron Chem. Co. v. Streett Indus.*, 534 F.Supp. 801 (E.D.Mo.1982); D. Dobbs, *Remedies* § 5.10, at 377 (1973) (hereinafter *Remedies* ); *Damages in Tort, supra* § 37.0[1][b], at 19; C. McCormick, *Handbook on the Law of Damages* § 44 (1935). "The theory underlying this rule is that if the owner of lost or destroyed property is a retailer ... the goods may be replaced at their wholesale value and subsequently sold at retail just as the original goods would have

sold." *Chevron*, 534 F.Supp. at 803. Because a retailer purchases goods at wholesale and then sells the goods at retail, awarding a retailer the retail market value of damaged or lost goods would be tantamount to giving the retailer his or her profits without the retailer having to incur the expense of selling the goods. *Remedies, supra* § 5.10, at 376; *see also Ocean Elec. Co.*, 636 So.2d at 115; *cf. Omura v. American River Investors*, 78 Hawai'i 416, 418, 894 P.2d 113, 115 (App.1995) ("Damages for lost profits cannot be determined by total gross revenues.") (citations omitted).

■ Therefore, the damages award for lost or destroyed property should be based upon the market value, retail or wholesale, which will actually or as precisely as possible compensate the injured party. *See Amfac, Inc.*, 74 Haw. at 128, 839 P.2d at 32; *Damages in Tort, supra* § 37.01[1][b], at 18.

### 3.

■ Because United was a rental company it was not strictly a consumer or a retailer. In this case, the stolen truck was part of United's fleet of rental vehicles. Conceivably, United could purchase a replacement either in the retail or the wholesale market. If United made purchases on a regular basis as a typical retailer, then the truck's value should be based on the retail market value. However, according to the testimony of Martin Yasuda (Yasuda), United's President, the truck had been one of ten trucks purchased in bulk from one seller, and it would "probably cost [United] too much to buy another one." Also, according to Victoria Yasuda, United's bookkeeper (the Bookkeeper), United always purchased its vehicles in bulk to enable it to purchase the vehicles at "wholesale" prices. Thus, it may be fairly inferred that United could only purchase at wholesale prices if it purchased its trucks in bulk. There was no evidence that a single vehicle replacement could be purchased by United at

---

13. The Kelly bluebook is an authoritative reference book utilized when making evaluations regarding the value of automobiles.

14. A consumer is a person "who purchase[s], use[s], maintain[s], and dispose[s] of products

and services." *Black's Law Dictionary* 306 (6th ed.1990).

15. A retailer is a "person engaged in making sales to ultimate consumers." *Black's Law Dictionary* 1315 (6th ed.1990).

the wholesale price.[16] Hence, the evidence supports the conclusion that unless United was buying in "bulk," the wholesale market was not available to it.[17]

As a result, the market price which would accurately or as precisely as possible compensate United for its stolen truck, under these circumstances, was the retail market price. *See Richards,* 10 Haw.App. at 623, 880 P.2d at 1238–39 ("All of the different measures for damages to personal property are merely guides to common sense, and the question in each case is ultimately a question of fully compensating the injured party. Thus, the various measures should be adjusted as required to meet the goal of compensation. It follows then that no mechanical rule can be applied with exactitude in the assessment of property damage and each case must rest on its own facts and circumstances as supported by the proof in the record.") (citations, internal quotation marks, and ellipsis points omitted).

The trial court's award was consistent with the proof of market value submitted by United and did not, under the evidence, amount to a windfall profit to United. The evidence presented by United was adequate to establish the replacement cost or value of the truck. In this context, the trial court's acceptance of United's expert opinion was reasonable. *Cf. J.E. Faltin Motor Transportation, Inc. v. Eazor Express, Inc.,* 273 F.2d 444, 446 (3rd Cir.1959) ("The trailer was completely destroyed by fire. All that remained was a mass of molten metal impossible to repair. It was a 1956 model and its market value at the time of the fire (1957), naturally was subject to dispute. The trial judge, sitting without a jury, heard testimony on this subject. He credited one expert and not others. This is a situation in which the essential responsibility for fact-finding is entrusted to the trial judge. We cannot say here that his conclusion was 'clearly erroneous.' ") Therefore, we hold that the trial court correctly adopted the retail market value as the appropriate standard for measuring the replacement cost of a single truck to United.

## IV.

Kleenco also challenges the trial court's award of loss of use damages. In its complaint, United had sought damages for "[l]oss of use of vehicle." In its oral ruling, the trial court "den[ied] the request for lost profits" [18] and awarded United $550.00 for "[l]oss of vehicle use," the $550.00 representing "one month of rental."

On appeal, Kleenco contends that "[t]he trial court erred in awarding United 'lost volume' damages although United failed to present any evidence of the net profits it would have made from one month's rental." Kleenco argues that "damages for business lost volume are limited to loss of *net profit,*" and therefore, a "party seeking lost volume damages must prove what those net profits are." Although Kleenco uses the term "lost volume damages," Kleenco is really arguing the law of lost profits.[19]

---

**16.** There is no evidence that United made or intended to make a bulk purchase within a reasonable time of the theft of its truck.

**17.** At the hearing regarding Kleenco's motion to alter or amend the judgment, the court gave the following explanation for its decision to value the truck at the retail rather than the wholesale market price: "—whether or not the amount should be based upon retail or upon a wholesale fleet price. It's clear from this case that [United] was not in a position to make a fleet purchase at will.... This Court will, therefore, deny this motion."

**18.** Contrary to the court's statement, United had not requested "lost profits." However, Kleenco had argued lost profits as a measure of loss of use damages. *See* discussion *infra* part IV.

**19.** Apparently, Kleenco derives the term "lost volume damages" from the *Restatement (Second) of Contracts* § 347 comment f (1991) which relates to lost profits:

Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract. Since entrepreneurs try to operate at optimum capacity, however, it is possible that an additional transaction would not have been profitable and that the injured party would not have

■ Lost profits damages and loss of use damages are not synonymous.

Loss of profits [are] measured by the amount of profit that a plaintiff could prove would have been generated had the plaintiff not been deprived of the use of the property, less the amount of profit actually generated during the deprivation. Loss of use, on the other hand, is the loss of an incident of ownership—the right to use.

*American Tel. & Tel. Co. v. Connecticut Light & Power Co.*, 470 F.Supp. 105, 108 (1979).

### A.

■ Because United is seeking loss of use damages related to the time required to replace the property, we are presented with the issue of whether or not loss of use damages are recoverable in a case of total loss of property.

While loss of use damages are normally awarded to a party deprived of a vehicle during the period of repair, traditionally, recovery could not be had for loss of a vehicle's use during the period required to replace it. *Damages in Tort, supra* § 37.54[1], at 166–67; *McCormick, supra* § 124.

The general rule regarding damages occasioned by the total destruction of one's motor vehicle has long been limited to recovery simply for the vehicle's value at the time of destruction. The reason for this rule is not clear. It may be based upon the historical limitation contained in an action for trover at common law; or because plaintiff has the presumed ability to enter the marketplace with the sum awarded and purchase another product; or perhaps upon the theory that in recovering the full value of the vehicle as of the date

of destruction, the owner has been made whole.

*Allanson v. Cummings*, 81 A.D.2d 16, 439 N.Y.S.2d 545, 546–47 (1981) (citations and internal quotation marks omitted); *see also* Annotation, *Recovery for Loss Of Use Of Motor Vehicle Damaged or Destroyed*, 18 A.L.R.3rd 497 (1968) (hereinafter Annot., *Recovery For Loss Of Use*, 18 A.L.R.3rd 497). However, a "growing number of state and federal courts, . . . have abandoned the traditional approach and have awarded damages for loss of use in cases of total destruction." *Damages in Tort, supra* § 37.54[1], at 166–67; *Guido v. Hudson Transit Lines*, 178 F.2d 740 (3rd Cir.1950); *Atlantic Aviation Corp. v. United States*, 456 F.Supp. 121 (D.Del.1978); *Reynolds v. Bank of America*, 53 Cal.2d 49, 345 P.2d 926 (1959); *New York Cent. R.R. Co. v. Churchill*, 140 Ind.App. 426, 218 N.E.2d 372 (1966); *Weishaar v. Canestrale*, 241 Md. 676, 217 A.2d 525 (1966); *Allanson*, 81 A.D.2d 16, 439 N.Y.S.2d 545.[20]

The abandonment of the distinction between loss occurring from repairable vehicles and totally destroyed vehicles is based upon the realization "that the economic loss to the owner who is deprived of a vehicle because it has been totally demolished is the same as the loss to the owner who is deprived of a vehicle during the period required for repair." *Damages in Tort, supra* § 37.54[1], at 169; *see also New York Cent.*, 218 N.E.2d at 376 ("We fail to see any valid reason for the distinction between repairable and irreparable damage which would justify loss of use for the former and not the latter. . . . Have not both property owners lost the same thing, i.e., the use of such property?"); *Remedies, supra* § 5.11, at 385. We agree with this reasoning and, therefore, adopt the rule

---

chosen to expand his business by undertaking it had there been no breach. It is sometimes assumed that he would have done so, but the question is one of fact to be resolved according to the circumstances of each case.

**20.** Additionally, some states, such as Arkansas and Maine, provide for recovery for loss of use of a totally destroyed vehicle by statute. Ark.Code. Ann. § 27–53–401 (1987) ("In all cases involving damage to motor vehicles, the measure of damages shall be the difference between the value of the vehicle immediately before the damage occurred and the value after the damage occurred,

plus a reasonable amount of damages for loss of use of the vehicle."); 14 M.R.S.A. § 1454 (1980) ("In any action where recovery is sought for the destruction or damage of a motor vehicle, the owner of such motor vehicle shall be entitled to recover reasonable rental costs actually expended for a replacement motor vehicle during such time, not to exceed 30 days, as the damaged motor vehicle could not be operated or during such time, not to exceed 30 days, as is required to obtain a replacement vehicle for the destroyed motor vehicle.")

that damages for loss of use may be recovered when a vehicle is totally destroyed. Because a vehicle is a complete loss if stolen, a stolen vehicle should be treated in the same way as a completely destroyed vehicle for purposes of loss of use damages.

 However, recovery for loss of use damages must be limited to a period of time reasonably necessary for securing a replacement. *Nashban Barrel & Container Co. v. G.G. Parsons Trucking Co.*, 49 Wis.2d 591, 182 N.W.2d 448, 454 (1971); *Cecere v. Harquail*, 104 A.D.2d 6, 481 N.Y.S.2d 533 (1984); *Remedies, supra* § 5.11, at 385. Here, United indicated it could not afford to purchase a replacement. But, a plaintiff's recovery should not be premised on his or her actual ability to purchase a replacement. *See, e.g., New York Cent.*, 218 N.E.2d at 377 (holding that a plaintiff who did not replace a destroyed tractor-trailer due to lack of funds and failure to find a suitable replacement could recover for loss of use of the vehicle, limited to a reasonable time); *Chesapeake & O. Ry. Co. v. Boren*, 202 Ky. 348, 259 S.W. 711 (1924) (holding plaintiff who did not purchase an available replacement because of financial inability, could nonetheless recover for loss of use of a totally destroyed car); *Menard v. Prejean*, 374 So.2d 1275 (La.Ct. App.1979) (holding that where the owner of a tractor knew immediately after the accident that the tractor was a total loss, damages for loss of use were not recoverable beyond a reasonable time, limited to 30 days, notwithstanding the owner's financial inability to replace the property for eight months); *Holmes v. Raffo*, 60 Wash.2d 421, 374 P.2d 536 (1962) (holding that the court could not condone conditioning recovery on one's financial ability to hire another automobile because plaintiff would be denied compensation for his inconvenience resulting from the wrongful act of the defendant).

The rationale supporting this proposition is that regardless of whether the plaintiff furnishes the funds to hire a substitute vehicle, he or she still suffers an injury while deprived of the vehicle and should be awarded damages for the inconvenience. Annot., *Recovery For Loss Of Use*, 18 A.L.R.3d 497, 531–32.[21]

### B.

#### 1.

There are several mutually exclusive means of measuring damages for loss of use. They are: "(1) the rental value or the amount that could have been realized by renting out the property; (2) the reasonable cost of renting a substitute; or (3) the ordinary profits that could have been made from the use of the property." *Damages in Tort, supra* at § 37.13[1], 73–74; *see also Remedies, supra* § 124, at 387–90.

United did not rent a substitute. Therefore, option number two is inapplicable. The third option is usually only used to determine loss of use damages when a rental substitute is not available or when the kind of property damaged is not the type that is normally rented. *Southern Crate & Veneer Co. v. McDowell*, 163 Ga.App. 153, 293 S.E.2d 541 (1982) (holding that in an action to recover damages to a pulpwooder truck, where there was testimony that pulpwood machinery could not be rented, the jury was properly instructed as to lost profits); *Peterson v. Bachar*, 193 Kan. 161, 392 P.2d 853 (1964) (holding that plaintiff, whose truck was demolished in an accident, could not recover lost profits unless he could show that he could not obtain a suitable substitute vehicle); *Chlopek v. Schmall*, 224 Neb. 78, 396 N.W.2d 103, 110 (1986) ("Where property used for commercial or business purposes cannot be rented, then loss of profits may establish the reasonable value of the loss of use."); *King Logging Co. v. Scalzo*, 16 Wash. App. 918, 561 P.2d 206 (1977) (holding that in an action by a logging company against a carrier for damage to a log yarder, proof of lost profits, income or business could be considered by the trier of fact as evidence of loss

---

**21.** Neither party contends that one month was an unreasonable amount of time upon which to base an award of damages for loss of use. By the time of trial, United still had not replaced the truck. Thus, United was deprived of the use of the truck from January 1988 through June 1991, approximately forty-one months. Under these facts, we believe loss of use damages based upon one month was well within reason.

of use where the plaintiff could not obtain a substitute log yarder despite efforts to do so); *Damages in Tort, supra* § 37.13[2], at 76; *Remedies, supra* § 5.11, at 387. United did not present any evidence that a rental substitute was unavailable, and clearly the truck does not qualify as the type of property which is not normally rented. Consequently, option number three is also inapplicable.

Thus, the appropriate means of measuring damages for loss of use is rental value. In cases where the owner of damaged property is in the business of hiring the property out, courts recognize that the rental value also reflects gross profits and hence must be adjusted accordingly. *Oil Screw Noah's Ark v. Bentley & Felton Corp.*, 322 F.2d 3, 8 (5th Cir.1963) ("Detention [amount of time without the property], generally speaking, may be calculated by gross operating profits *less* savings, or net profits *plus* out-of-pocket expenses."); *Brown v. Zimbrick Logging, Inc.*, 273 Or. 463, 541 P.2d 1388, 1392 (1975) (holding that trial court's award, which was less than that established by plaintiff's evidence, sufficiently reflected any wear and tear and depreciation which plaintiff may have realized); *Remedies, supra* § 5.11, at 388. Therefore, whatever the owner has saved in overhead or other costs while the property is being repaired must be deducted from an award for loss of use damages. We believe this rationale applies equally to a case of total loss.

Here, the court awarded loss of use damages based upon the amount that would have been received from renting out the truck for one month, without any deductions. At trial, Yasuda testified that the truck was rented out at a daily rate of $35, a weekly rate of $175, and a monthly rate of $550.[22]

When the court heard Kleenco's motion to alter or amend the judgment, it stated:

> [Kleenco's counsel] has a point in that there are certain amount of expenses that should be deducted from the 5–50[sic]. This amount seems to be rather minuscule. The best this Court can estimate is approximately a dollar a day, or perhaps $30

at best. Viewing, however, that this is a fairly new vehicle, the court does not believe that there was very much, if any, maintenance expense.

Consequently, although the court acknowledged that the $550 award based on rental value should reflect appropriate deductions, it made none to the award.

■■ The rental value awarded as the measure of loss of use damages should have been reduced by the amount that United saved in overhead or other associated costs while not in possession of the truck. Because United presented no evidence of these costs, the trial court erred in calculating loss of use damages at $550. *Cf. Ferreira*, 44 Haw. at 576, 356 P.2d at 656 ("The extent of plaintiff's loss must be shown with reasonable certainty and that excludes any showing or conclusion founded upon mere speculation or guess."); *Omura*, 78 Hawai'i at 418, 894 P.2d at 115 (holding that plaintiff fails to prove lost profits, i.e. net profits, where the plaintiff submits evidence of lost gross sales revenue but neglects to submit any evidence of costs or expenditures related to the gross sales revenue).

### 2.

Accordingly, although United proved loss of the use of its truck, United is only entitled to nominal loss of use damages because it failed to prove the associated costs which should have been deducted from the rental amount awarded. *Ferreira*, 44 Haw. at 576, 356 P.2d at 656 ("To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which afford a basis for measuring the plaintiff's loss with reasonable certainty."); *Omura*, 78 Hawai'i at 418, 894 P.2d at 115 (holding that when plaintiff has proven injury but has failed to prove the amount of damages, the plaintiff is only entitled to nominal damages).

### V.

■■ Lastly, Kleenco contends that the court erred in permitting the Bookkeeper to

---

**22.** Yasuda stated that $572.94 would be the standard figure for measure of loss in circumstances where United expected insurance coverage for theft. Both at trial and on appeal, United did not explain why the $550 rental amount would be adjusted to $572.94.

testify as a rebuttal witness for United's benefit. Rules of the Circuit Court of the State of Hawai'i (RCCH) Rules 12, 12.1, and 18(a)(1) [23] require that prior to trial the parties list the witnesses that they intend to call.

No witness lists were prepared pursuant to RCCH Rule 18(a)(1). However, witness lists were prepared pursuant to RCCH Rules 12 and 12.1.

Because the provisions of RCCH Rules 12 and 12.1 are comparable to RCCH Rule 18(a)(1), we apply the standards applicable to Rule 18. This court has stated that RCCH Rule 18(a)(1) "must be scrupulously followed in order to have a fair trial." *Nature Conservancy v. Nakila*, 4 Haw.App. 584, 594, 671 P.2d 1025, 1033 (1983) (citation and internal quotation marks omitted). However, RCCH Rule 18(a)(1) "does not pose an absolute bar to the testimony of undisclosed witnesses." *Azer v. Myers*, 8 Haw.App. 86, 131, 793 P.2d 1189, 1215, *aff'd in part rev'd in part*, 71 Haw. 506, 795 P.2d 853 (1990). In addition, "[t]he introduction of evidence in rebuttal ... is a matter within the discretion of the trial court and appellate courts will not interfere absent abuse thereof." *Yorita v. Okumoto*, 3 Haw.App. 148, 156, 643 P.2d 820, 826 (1982); *see also Hawaii Housing Authority v. Lyman*, 68 Haw. 55, 74, 704 P.2d 888, 899 (1985). Consequently, the circumstances surrounding the court's decision to allow the rebuttal witness to testify must be examined.

At the beginning of trial, United stated that the Bookkeeper would "be available as

[a] rebuttal witness" "depend[ing][on] what [Kleenco's] case puts on[.][sic]" [24]

During United's case, Kleenco questioned Yasuda about United's general ledger depreciation schedule (depreciation schedule) which had been marked for identification. The schedule was based on a "200%" or double declining depreciation method. Yasuda was unable to testify as to whether United had taken the full depreciation of the truck, but under further examination indicated that the "Net Book Value" of the truck listed in the depreciation schedule read, "[$]2,000.00."

At the end of its case, United's counsel stated, "The only other witness we do have is [the Bookkeeper], and we will reserve the right to call her as a rebuttal witness after [Kleenco] has finished its case, and it has to do with damages."

Subsequently, Kleenco offered the depreciation schedule into evidence as part of its own case. The court, noting its "limited relevancy" with respect to damages, received the depreciation schedule into evidence over United's objection. United then called the Bookkeeper in rebuttal in part to explain the depreciation schedule.

Kleenco objected to the calling of the Bookkeeper on the basis that there was not "any kind of surprise that would justify [United's] calling [the Bookkeeper]," and Kleenco had "never had an opportunity to depose [the Bookkeeper]." In overruling the

---

**23.** The Rules of the Circuit Court of the State of Hawai'i Rules 12, 12.1, and 18 provide as follows:

**Rule 12. Ready civil calendar.**

. . . .

(b) *Pretrial Statement.* ... shall contain the following information:

. . . .

(4) The names, addresses, categories (i.e., lay, eye, investigative), and type (i.e., liability, damages) of all non-expert witnesses reasonably expected to be called by the party submitting the statement and a general statement concerning the nature of the testimony expected[.]

**Rule 12.1. Civil settlement conference; settlement conference statement.**

. . . .

(b) *Settlement Conference Statement.* ... The statement shall set forth, wherever applicable, the following information:

(1) For the plaintiff:

. . . .

(x) The names, address and summary of substance of testimony of all other witnesses who support plaintiff's position on damages[.]

**Rule 18. Pre-trial disclosure and marking of exhibits.**

(a) *Disclosures and Exhibits.* When a pre-trial is held, except as and to the extent otherwise ordered by the court:

(1) Each party shall disclose the theory of his [or her] case, including the basic facts that he [or she] intends to prove and the names and addresses of all witnesses that he [or she] intends to call.

**24.** At this point in the trial, United was seeking permission for the Bookkeeper and Martin Yasuda, another witness, to remain in the courtroom for the trial despite the witness exclusionary rule.

objection and allowing the Bookkeeper to testify, the court stated:

> Assuming this Court makes a finding there is liability on the part of [Kleenco] and I [the judge] need to determine damages, there's a number of ways this Court can do that. That includes the fair market value method or by using whatever alternative means, such as that being suggested by [Kleenco's counsel]. In this regard, though, I do believe the right of rebuttal does lie, and I will allow [United's counsel] to call the witness over objection by [Kleenco].

"The general rule is that the party upon whom the affirmative of an issue devolves is bound to give all his evidence in support of the issue in the first instance, and will not be permitted to hold back part of his evidence confirmatory of his case and then offer it on rebuttal." *Yorita*, 3 Haw.App. at 157, 643 P.2d at 827 (citation and internal quotation marks omitted). The rule, however, "is not so easily applied when the evidence is a negative of a potential defense." *Id.*

Here, United sought to present the Bookkeeper as a rebuttal witness for two reasons: (1) to rebut Kleenco's contention that employing a "[retail] market value basis" in determining the value of the truck would be objectionable, and (2) to explain the depreciation schedule that Kleenco had offered into evidence, because the Bookkeeper had prepared the depreciation schedule in question.

The Bookkeeper's testimony was necessary for the court's understanding of Kleenco's depreciation exhibit. Kleenco knew of the Bookkeeper's existence. Moreover, the evidence elicited from the Bookkeeper was the evidence which Kleenco had attempted to but had been unable to extract from Yasuda. Finally, the purported materiality of the depreciation schedule was largely abandoned.[25] Based on the court's explanation and the circumstances of the case, we conclude that the court did not abuse its discretion in allowing the Bookkeeper to testify.

## VI.

For the foregoing reasons, we affirm the October 15, 1991 judgment except for that part awarding damages for loss of use. As to such damages, we remand for entry of judgment awarding nominal damages.

---

**25.** At one point, Kleenco's theory of damages appeared to have involved the "double declining" depreciation schedule which was admitted into evidence. However, during trial, Kleenco did not establish how the depreciation schedule related to the value of the truck or in the final argument explain its relationship to its theory of damages.

The trial court did not refer to depreciation in its calculation of market value or loss of use value. It stated, "I do understand that when using double declining balance that may have no relationship to the actual value of the item being used in business." Consequently, the trial court did not rely on or make any findings regarding the schedule.

On appeal, Kleenco does not develop any argument regarding depreciation. On the facts, the fair market value of the truck, as arrived at by United's expert, took into consideration the depreciated value of a like vehicle at the time of the theft.