*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| THE HAPPY FARMER, LLC, d/b/a Releaf Alaska, | ) ) ) | Supreme Court No. S-17928 |
| Appellant, | ) ) | Superior Court No. 3PA-18-02656 CI |
| v. | ) ) | O P I N I O N |
| ALASKA STATE FAIR, INC., | ) ) | No. 7561 – October 29, 2021 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: John C. Pharr, Law Offices of John C. Pharr, P.C., Anchorage, for Appellant. A. Michael Zahare and Kenneth G. Hannam, Clayton & Diemer, LLC, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Borghesan, and Henderson, Justices. [Carney, Justice, not participating.]

WINFREE, Chief Justice.

## I. INTRODUCTION

A vendor entered into an agreement for a merchandise booth inside a fairground building. After an unknown thief broke into the building and stole a significant amount of the vendor's merchandise, the vendor sued the fair organization on contract and bailment theories. The superior court granted summary judgment in

favor of the fair organization, and the vendor appeals one aspect of the superior court's decision regarding bailment law. Based on the undisputed facts we see no error in the superior court's application of bailment law, and we affirm the superior court's decision.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Happy Farmer, LLC, d/b/a Releaf Alaska (Releaf) entered into a written agreement, referred to as a lease, with Alaska State Fair, Inc. (Fair) for indoor vendor space during the 2017 Palmer fair. The agreement incorporated a vendor handbook. The handbook indicated that although some liability insurance coverage was included for most vendors: "This insurance does not cover merchandise and it is recommended that vendors purchase individual coverage." The handbook noted that Fair provided 24-hour security services but cautioned in bold text: "Fair takes no responsibility for theft, loss, or vandalism of any type. This is the vendor's sole responsibility."

Releaf set up its indoor booth and brought merchandise to the fairground building, using its own locking display cases and cabinets for which only Releaf had keys. Fair's security company locked the building each night and unlocked it each morning. An unknown thief broke into the building one night and stole a significant amount of Releaf's merchandise.

### B.     Proceedings

Releaf sued Fair, alleging breach of contract and bailment claims.[1]  Fair

---

[1]     "A bailment is 'a delivery of personal property by one person to another in trust for a specific purpose, with an express or implied contract that the property will be returned or accounted for when the specific purpose has been accomplished or when the bailor reclaims the property.' " *Alaska Constr. Equip., Inc. v. Star Trucking, Inc.*, 128 P.3d 164, 168 n.13 (Alaska 2006) (quoting *United Truck Rental Equip. Leasing, Inc. v. Kleenco Corp.*, 929 P.2d 99, 103 (Haw. App. 1996)); *see also* 8 C.J.S. *Bailments* § 1
(continued...)

sought summary judgment,[2] arguing that there was no breach of contract because the lease agreement did not obligate Fair to "safeguard . . . inventory from theft" and that there was no bailment relationship between the parties. Releaf opposed Fair's summary judgment motion and sought partial summary judgment on Releaf's bailment claim. The superior court granted summary judgment to Fair on both the contract and bailment claims, concluding that under the contract Fair was not responsible "for property theft or damage" and that Fair was not a bailee of Releaf's merchandise.

Releaf appeals, contending that the superior court erred by granting Fair summary judgment and by denying Releaf partial summary judgment on its constructive or implied bailment claim. Releaf does not appeal the court's rulings that there was no express bailment relationship and that Fair was entitled to summary judgment on the breach of contract claim.

## III. STANDARD OF REVIEW

"We review a grant of summary judgment de novo,"[3] and we must "determine whether there was a genuine issue of material fact and whether the moving

---

[1]    (...continued)
(Aug. 2021 Update) ("A 'bailment' is an agreement, either express or implied, that one person will entrust personal property to another for a specific purpose and that, when the purpose is accomplished, the bailee will return the property to the bailor or otherwise deal with it according to the bailor's directions, or keep it until the bailor reclaims it, as the case may be." (footnotes omitted)).

[2]    *See* Alaska R. Civ. P. 56(c) (allowing party to seek summary judgment if it can "show[] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law").

[3]    *Arnoult v. Webster*, 480 P.3d 592, 596 (Alaska 2020) (quoting *Harrell v. Calvin*, 403 P.3d 1182, 1185 (Alaska 2017)).

party was entitled to judgment on the law applicable to the established facts."[4]

## IV.  CONSTRUCTIVE OR IMPLIED BAILMENT

### A.  Constructive Bailment

A constructive bailment is implied by law[5] and is created when a person comes into lawful "possession of personal property of another and holds it under circumstances whereby [that person] should, on principles of justice, keep it safely and restore it or deliver it to the owner."[6] Constructive bailment arises when "possession of goods or chattels passes to a person (who is not the owner) by mistake, accident," or other circumstances imposing legal obligations and duties.[7]

Releaf does not explain how a constructive bailment theory applies to this case's facts. Fair did not mistakenly or accidentally come into possession of Releaf's merchandise, and it is unclear what other circumstances or considerations would require

---

[4]  *Id.* (quoting *Palmer v. Borg-Warner Corp.*, 818 P.2d 632, 634 (Alaska 1990)).

[5]  *See Bailment*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining constructive bailment as "[a] bailment that arises when the law imposes an obligation on a possessor of personal property to return the property to its rightful owner, as with an involuntary bailment[;] . . . . [f]or example, a police department becomes a constructive bailee for an impounded vehicle").

[6]  8 C.J.S. *Bailments* § 14 (Aug. 2021 Update); *see also Bank of N.Y. v. Sumter Cnty.*, 691 S.E.2d 473, 479 (S.C. 2010) ("A constructive bailment arises when one person has lawfully acquired possession of another person's personal property, other than by virtue of a bailment contract, and holds it under such circumstances that the law imposes on the recipient of the property the obligation to keep it safely and redeliver it to the owner." (quoting *Hadfield v. Gilchrist*, 538 S.E.2d 268, 272 (S.C. App. 2000))); *Woodson v. Hare*, 13 So.2d 172, 174 (Ala. 1943) ("A constructive bailment arises where a person having possession of a chattel holds it under such circumstances that the law imposes upon [that person] the obligation to deliver it to another.").

[7]  19 WILLISTON ON CONTRACTS § 53:3 (4th ed. 2016).

the law to impose a constructive bailment for Releaf's benefit. The superior court thus did not err by concluding there was no constructive bailment.

### B. Implied Bailment

Bailment also may be implied by fact:

> A contract of bailment may be implied from the circumstances of a transaction or from the words and acts of the parties evincing a purpose to enter into that relation toward the property . . . . [A]bsent some form of understanding between the parties, the formation of an implied-in-fact bailment contract cannot take place. . . . The facts surrounding the transaction in question must be analyzed to determine the existence of an implied-in-fact bailment.[8]

At minimum, facts must show an understanding that one party will have "exclusive possession, control, and dominion over" the property at issue.[9]

Releaf suggests that a bailment may be implied based primarily on the following: (1) Fair agreed to allow Releaf to occupy booth space for a flat fee; (2) Fair permitted Releaf to leave merchandise in the space overnight; (3) Fair provided overnight security for the fairgrounds; and (4) Fair's security had the only keys to the building where the booth was located. But these facts are insufficient to reasonably infer

---

[8] 8A AM. JUR. 2D *Bailments* § 37 (2021); *see also Green v. Koslosky*, 384 P.2d 951, 952 (Alaska 1963) (footnotes omitted) (suggesting bailor/bailee relationship need not be express).

[9] *See J.P. Enters. v. Ursin Seafoods, Inc.*, 777 P.2d 1165, 1166 (Alaska 1989) ("The test in determining whether a transaction is a bailment or a lease is whether the person leaving the property made such a delivery of the property as to amount to a relinquishment of exclusive possession, control, and dominion over the property so that the person on whose premises it was left can exclude the possession of all others." (quoting 8 C.J.S. *Bailments* § 8 (1988))).

Fair's exclusive possession, dominion, and control over Releaf's merchandise.[10]

The fundamental flaw in Releaf's argument is its failure to point to any non-contractual action by Fair that could give rise to an inference of an implied in fact bailment. Releaf concedes that Fair had no contractual duty to protect Releaf's merchandise. And Releaf concedes the contractual agreement did not create an express bailment. Releaf acknowledged that its agreement with Fair did not require leaving merchandise in the booth overnight, that other vendors took their merchandise home every night, and that Releaf did not pay a fee for leaving its merchandise overnight. Releaf maintained some degree of possession over the merchandise by locking it inside its own cabinets and display cases and retaining the only keys to them. Under the agreement's terms Fair clearly disclaimed any obligation for Releaf's merchandise. The relevant undisputed facts thus reflect that Fair did not have exclusive possession of Releaf's merchandise after operating hours.

Releaf argues that this case is similar to *J.P. Enterprises v. Ursin Seafoods, Inc.*[11] J.P. Enterprises operated a storage yard where it permitted fishing gear storage, and Ursin stored crab pots in J.P.'s yard.[12] J.P. billed Ursin annually based on the pots it stored, and Ursin was permitted to move its pots in and out of the yard but had to provide written notice before removing pots that it sold.[13] Ursin noticed some pots were missing, and it sued J.P. for the value of the missing pots. The issue was whether J.P.

---

[10]     *See id.*

[11]     *Id.* at 1165.

[12]     *Id.*

[13]     *Id.*

and Ursin had a bailee/bailor or lessee/lessor relationship.[14]  We held that J.P. was a bailee, reasoning that J.P. had "exclusive possession, control, and dominion over the property"[15] based on the following facts:  (1) Ursin could remove and store its pots at will, but J.P. required notice if Ursin sold its pots; (2) J.P. assessed a fee based on the number and type of pots stored; and (3) "J.P. restricted entry to the storage yard by fencing the area and providing keys to its customers."[16]

The lease or bailment analysis central to *J.P. Enterprises* is not on point for this case.  The issue in that case was whether the parties' agreement was properly characterized as a lease of land to store crab pots or as a bailment contract.[17]  Releaf and Fair agree that their agreement permitted Releaf to use the designated booth space inside Fair's building to sell merchandise during operating hours.  They dispute the nature of their agreement regarding the merchandise *after* operating hours.  Releaf argues that the agreement between Fair and Releaf is properly categorized as a license rather than a lease.  But assuming Releaf is correct that the agreement "merely entitle[d] [Releaf] to use the land of another for a specific purpose, subject to the management and control retained by the owner," the agreement concerns booth space, not merchandise, and does not suggest an implied bailment.  Concluding that the parties' agreement described a lease, license, or something else during operating hours is irrelevant to their agreement regarding after-hours possession of and obligations about the merchandise.  Even if Fair controlled all aspects of Releaf's use of the booth space, it begs the question whether Fair also agreed to an after-hours bailment obligation for the merchandise.

---

[14]     *Id.*

[15]     *Id.* at 1166 (quoting 8 C.J.S. *Bailments* § 8 (1988)).

[16]     *Id.* at 1165.

[17]     *Id.*

The facts of this case also are distinguishable from those in *J.P. Enterprises*. *J.P. Enterprises* involved an agreement that required notice of items sold, but Releaf was not required to inform Fair about where Releaf's merchandise was located or whether it was kept in the booth overnight. In *J.P. Enterprises* a fee was assessed based on the number and type of pots stored,[18] but the flat fee Releaf paid for booth space was no higher for leaving its merchandise overnight. Finally, J.P. "restricted entry to the storage yard by fencing the area and providing keys to its customers."[19] Although Fair similarly locked the doors to its building, Releaf maintained possession of its merchandise by locking its products in display cases and keeping the only keys. Unlike in *J.P. Enterprises*, the facts do not suggest that Fair took exclusive possession, control, and dominion over Releaf's merchandise.

Based on the foregoing, we conclude that the superior court did not err by granting summary judgment to Fair on the issue of implied in fact bailment.

## V. CONCLUSION

We AFFIRM the superior court's decision.

---

[18]  *Id.*

[19]  *Id.* at 1166.